[Civ. No. 40951. Second Dist., Div. Five. Apr. 11, 1974.]

JEAN HOWELL THOR, Plaintiff and Appellant, v. DAVID BOSKA, Defendant and Respondent.

**COUNSEL**

Hirson & Horn, Robert M. Fox and Alan M. Salkow for Plaintiff and Appellant.

Bonne, Jones & Bridges, David J. O'Keefe and Ellis J. Horvitz for Defendant and Respondent.

**OPINION**

**KAUS, P. J.**—Medical malpractice. Plaintiff Jean Thor appeals from a judgment, after a jury verdict, in favor of Dr. David Boska.

## FACTS

There is no dispute concerning certain basic facts. Defendant, a general practitioner, began seeing plaintiff as a patient in 1963. In August or September 1965 plaintiff showed him a lump on her left breast. Defendant performed no tests and did not suggest that plaintiff see a specialist. According to plaintiff, he told her that there was nothing to worry about, that it was a freely movable cyst, and that she was to let him know if it changed. In December 1966 plaintiff noticed that the lump had suddenly doubled in size: "It could have been overnight." She again showed it to defendant. Again defendant performed no tests, and did not refer her to any other physician. Instead, on January 11, 1967, she was given a shot of Depo-Provera. On January 30 defendant gave her C-Quens pills. Depo-Provera is a hormone drug that is sometimes used to treat benign tumors. C-Quens are birth control pills. The last time defendant saw plaintiff as a patient was on January 30, 1967. She then consulted with other doctors and, on February 10, 1967, a radical mastectomy was performed. The biopsy revealed that cancer had spread from plaintiff's left breast through the lymph glands to her axilla. The experts disagreed whether, as of January 1972, the cancer had spread to other parts of plaintiff's body, particularly her liver.

The complaint was filed May 19, 1967, a little more than five months after plaintiff's surgery. It alleges the doctor-patient relationship between the parties, the 1965 visit when the lump in plaintiff's left breast was shown to defendant, his reassurance that it was "nothing," the sudden growth of the lump at the end of 1966, defendant's failure to recommend that plaintiff should see a specialist and his failure to perform any tests. Paragraph 15 of the complaint then states generally: "Defendant BOSKA was negligent in his examination and treatment of plaintiff, was negligent in his failure to properly diagnose plaintiff's condition, was negligent in failing to refer plaintiff to a specialist in connection with this condition and in failing to perform diagnostic tests, and was negligent in constantly reassuring plaintiff that said condition was 'nothing.'" More specifically, paragraph 16 charges: "Said negligence persisted from the time said lump, or mass, was first pointed out to the defendant as alleged in this Complaint, and continued until plaintiff sought other medical care in connection with said condition in approximately February of 1967." The answer was a general denial.

During discovery it soon appeared that defendant was unable to produce his original clinical records concerning his treatment of plaintiff. In answers to interrogatories he explained that: "The original records were

recopied in a more legible form . . . . Said recopied records were taken verbatim from the original records and do constitute the same clinical record." He maintained that the occasion when this was done was when he had been informed that plaintiff was going to see another doctor. He thought that the new doctor might want to review the records. It also appeared that the original records could not be located. Defendant could "only assume that they were thrown away."

In his answers to the interrogatories, defendant also claimed, without equivocation, that the first time he ever examined any lump or mass in plaintiff's breast was December 1, 1966. Plaintiff, on the other hand, was later to testify that when she first showed the lump to defendant, he drew a diagram showing its location on what she assumed to be a medical record. No such diagram appeared on the copy of the lost original records.

On January 3, 1972, when the case had been at issue for four and one-half years, defendant obtained a two-week trial continuance. On January 18 he filed an amended answer according to which "negligence is admitted as alleged in Paragraph 15 of the complaint." All other allegations of the complaint remained denied. We do not know whether the court noticed at the time that this left unadmitted the specific allegation of paragraph 16 that defendant's negligence "persisted from the time said lump . . . was first pointed out" to him. In any event, on the strength of the admission defendant then obtained a ruling from the trial court that any reference to his original records and their unavailability would be unduly prejudicial. (Evid. Code, § 352.)

█ The correctness of that ruling, which was first made during an unreported discussion before the trial started, is the only real issue before us. It was evidently generated by the court's belief that negligence was no longer in issue. The ruling was, however, repeated several times during the trial, although it became more and more plain that in view of the defense's narrow reading of the admission,[1] coupled with the nature of the conflicting evidence on causation, defendant had, in effect, admitted nothing.[2]

---

[1]The question before us is not, whether as a matter of pleading law such reading was correct. Defendant's position, in a nutshell, was that by admitting paragraph 15, while still denying paragraph 16, he admitted that he had been negligent at some time during his treatment of plaintiff, but did not admit negligence at any particular time.

[2]The court's belief to the contrary persisted throughout the trial. Thus, on page 807 of the reporter's transcript, when ruling on plaintiff's last attempt to have it reconsider its exclusionary ruling, it said: "Gentlemen, I think we have pursued this long enough. We have discussed this matter on a number of occasions prior to

The chimerical nature of defendant's admission can best be understood if we outline the parties' respective positions on the issue of causation.

The opinion of plaintiff's experts was that when defendant was first shown the lump, it was premalignant. Had it been excised at that time, no cancer would have developed, even at the site; obviously none would have spread out of the breast area. The cancer probably became invasive at the time when the lesion suddenly became larger in December 1966. Both the Depo-Provera and the C-Quens actually stimulated the cancer.

In summary, it was plaintiff's position that had the lesion been removed in 1965, her breast could have been saved; had more prompt action been taken in December 1966, the spreading of the malignancy out of the breast could have been avoided.

The view of defendant's expert agreed with plaintiff's only on the point that the lesion she showed defendant in 1965 was not malignant. He agreed on nothing else.

Defendant's theory was that even in August 1965 it was too late to avoid the consequences demonstrated by and after the February 1967 surgery. His expert, a Dr. Wilson, arrived at this opinion by working backward. It was his theory that cancer cells duplicate themselves at a definite rate—the so-called doubling time—which varies with each individual. Assuming that plaintiff's doubling time equalled the fastest ever observed clinically—23 days—he arrived at a figure of 693 days before the February 1967 surgery, when it effectively became too late to do anything for plaintiff except what was eventually achieved by the 1967 surgery.

Expert rebuttal by plaintiff was to the effect that Dr. Wilson's doubling time theory was just that, a theory postulated by "certain doomsday prophets." Its ultimate conclusion was that there was no need to treat cancers "because some people will live with their cancer for 40 years and some people will die of their cancer in four months." The theory cannot be relied on "in any single human case" because many different factors affect the growth rate of cancer. Some cells will grow "at a phenomenally

---

the time the trial started and prior to the selection of the jury at the time the defendant filed its amended Answer admitting the charging allegations of Paragraph 15. It was my opinion, and still is my opinion, that *in view of the admission of negligence on the part of the defendant, and the fact that only proximate cause and damages are the remaining issues at this particular time,* that the plaintiff's desire to get evidence of the suppression of records into the record at this time and to the jury really is a straw man and doesn't bear on the other issues, and that the effect of such admission would be highly inflammatory." (Italics added.)

rapid rate." A breast lesion may appear to double in size at the time the cancer cells "burst out through the ducts."

Obviously, on defendant's theory of causation, it made no difference when he was negligent: no intervention on his part could have improved plaintiff's lot. On plaintiff's theory, on the other hand, it was vital to establish when defendant committed malpractice: if it was in 1965, plaintiff simply would not have become a cancer victim; even if defendant was not negligent until December 1966, the cancer may not have "burst" completely out of her breast into the lymphatic system; only if the occasion of defendant's negligent mismanagement of his patient was postponed until late January 1967 could it be argued that it did not prevent additional metastasis.

The defense posture that its admission of paragraph 15 amounted to nothing more than a concession of malpractice when—even on plaintiff's experts' theory—it no longer mattered what defendant did or did not do, became gradually apparent. A sneak preview of the true tenor of the defense's position can be gleaned from its opening statement to the jury. Although counsel said that the issue of negligence was not being contested and conceded that "had Dr. Boska had a higher index of suspicion of malignancy . . . *particularly in December of 1966"* [italics added], "he would have referred the patient to a surgeon," and stressed that even the surgeon who eventually operated at first did not feel that there was anything to be concerned about, counsel depicted his client as a "well-qualified, well-trained general practitioner" who acted on his "best clinical judgment"; he claimed that neither in 1965 nor in December of 1966 did the lump have "characteristics that clinically would commonly be associated with a malignancy"; he questioned whether the lump shown Dr. Boska in 1965 or even the one presented in December of 1966 was the lump removed in February 1967,[3] and predicted "that the evidence is going to demonstrate that *if, indeed, there was any delay*[4] [italics added], insofar as diagnosing this breast lump as a malignancy, it has not in any way altered what Mrs. Thor's present ultimate prognosis is."

As the trial proceeded, the basic defense strategy became apparent:

---

[3]Somehow plaintiff's counsel was persuaded to stipulate that "in August or September of 1965, the defendant . . . was first made aware of a lump at the area of the left breast of plaintiff." It may be of significance that the defense would not stipulate that defendant had been made aware of "the lump." There is an intimation in the record that this stipulation may have been forced on plaintiff by the same ruling which suppressed evidence concerning the lost records.

[4]To doubt that delay changed the ultimate prognosis is entirely consistent with an admission of negligence; to question whether there was delay, is not.

whenever the question of admissibility of the loss of the original clinical record came up—as it frequently did—counsel dusted off his "admission of negligence." On at least two such occasions he even referred to it as an admission of "liability."

On the other hand, counsel never conceded that his client was negligent at any particular time. The trial court even ruled that it was for the jury to determine, after final argument, whether the admission of the allegations of paragraph 15 was "an admission of continuing negligence on his part during the entire time of treatment." Further, at defendant's request the court gave BAJI Nos. 6.02 ("Medical Perfection Not Required") and 6.03 ("Alternative Methods of Diagnosis or Treatment")[5]—instructions which are, essentially, exculpatory on the issue of professional negligence.

In brief, though it became clear to the point of demonstration that the admission did not justify depriving plaintiff "of the legitimate force and effect of material evidence" (*Fuentes* v. *Tucker,* 31 Cal.2d 1, 7 [187 P.2d 752]), the defense was permitted to use it for precisely that purpose during the entire evidence phase of the trial. Having successfully weathered all anguished attempts by plaintiff's counsel to get the court to change its mind, any pretense of a meaningful admission of negligence completely disappeared during defense counsel's closing argument, relevant portions of which are copied below.[6]

---

[5]We re-emphasize that we do not hold that the court erred in narrowly interpreting the so-called admission of negligence, with respect to such matters as instructions, arguments and admission of evidence generally. The problem is that on the question of suppressing evidence of defendant's "loss" of his original records, the court assumed and—in the teeth of everything that was going on—continued to assume a broad interpretation.

[6]"Now, it is true in this action we have stipulated to the issue of negligence in one respect. We have stipulated that at some point in time during Dr. Boska's care and treatment of Mrs. Thor, there was negligence in connection with a failure to recognize and diagnose that she had cancer in the breast. *When that point in time was is a matter for your determination.* We are not stating that Dr. Boska was negligent from the very first date that he saw Mrs. Thor back in 1963. *We are not stating that he was negligent from the time that she first presented with a breast lump in August of 1965.* Quite obviously, however, at some point in time while Mrs. Thor was under his care, she had breast cancer. At some point in time Dr. Boska failed to recognize the fact that she had breast cancer. This was probably an error in judgment, you know, as a professional person.

" . . . . . . . . . . . . . . . .

"Now, first of all, there is probably only one thing that plaintiff's counsel and myself have substantial agreement upon insofar as our theories in the case are concerned. I am in agreement that the lump that was felt, that was palpated back in August of 1965, was in fact a benign nodule, a benign lump. I don't believe that what was felt back in August of 1965 was a malignant lump. . . .

" . . . . . . . . . . . . . . . .

"Quite obviously, a physician, if he wished to, could simply say every patient who

### DISCUSSION

We are convinced that this record conclusively demonstrates a miscarriage of justice.

The fact that defendant was unable to produce his original clinical record concerning his treatment of plaintiff after he had been charged with malpractice, created a strong inference of consciousness of guilt on his part. He apparently claimed to have an innocent explanation: exact copying to make the records more legible and inadvertent loss of the originals.

presents to me with any kind of irregularity that I feel in the breast, I'm going to biopsy. But I submit to you, that would be very poor practice. I don't think you would have enough hospitals in the country to take care of all the women who would be having excess biopsies on their breasts if each and every woman who presented with any kind of irregularity in their breasts were subjected to biopsy procedure. *There has got to be an element of judgment involved.* And as I said before, nobody is gifted with infallible judgment. No physician is gifted with infallible judgment. On the basis of their training, their experience, their education, they try and exercise the best conceivable clinical judgment, and sometimes in retrospect that turns out to be wrong. *But an error in judgment does not in and of itself constitute negligence, it does not constitute malpractice.*

". . . . . . . . . . . . . . . .

"Now, there are only two alternatives; either back in August of 1965 this was a benign lesion, *in which event, I submit, my client didn't make an error in judgment.* What he felt he thought to be benign, was in fact benign. And if indeed it was benign, no surgical intervention of any kind was warranted at that time. . . .

"I believe, among other things, you will recall *Dr. Boska's testimony that at no time during the course of his care and treatment of this woman did he suspicion that she had a malignant lump.* At no time did the lump with which she presented have such indicia of malignancy to, in his judgment, warrant biopsy. But if you accept the plaintiff's very own theory in this case, that that started as a benign lesion, you have also got to accept the proposition that back in August of 1965 Dr. Boska made a correct determination insofar as his clinical observations and palpation of this lump was concerned. It was benign. And if it was benign, no surgical intervention of any kind was warranted. . . .

"But if, indeed, it was benign back in August, '65, and the doctor was correct in his clinical judgment, there is no negligence, there is no malpractice. He was absolutely correct in his clinical evaluation. . . .

". . . . . . . . . . . . . . . .

"*I submit to you that Dr. Boska was not negligent back in 1965, August of 1965. I submit that what he felt at that time was indeed a benign lump; that inasmuch as it was a benign lump, his clinical impression was correct. The standard of good medical care and good medical treatment would not have required any surgical intervention be performed at that time. . . ."*

". . . . . . . . . . . . . . . .

"*His Honor is going to tell you that an error in judgment does not constitute malpractice.* Quite obviously, we have admitted the malpractice in connection with some of the events which occurred on and after December of 1966. I don't think that in any way affected the ultimate prognosis, and I don't think it can be said, based upon reasonable medical probability, that it affected the ultimate prognosis in this case. Thank you." (Italics added.)

On that issue, at least, plaintiff's testimony that he did not copy the diagram drawn in 1965 would have been of relevance. The issue was, however, never tried. The court apparently felt that even if the jury did not accept the explanation—which, if believed, would have made the suppressed evidence irrelevant (Evid. Code, § 403)—the prejudicial effect would outweigh the probative value because negligence was admitted.

As we have seen, negligence as of 1965—vital to plaintiff on her experts' theory of causation—was never admitted. Here, too, her evidence that the record, as copied, did not contain the 1965 diagram would have been relevant: its omission would have pointed up a particular feeling of guilt with respect to defendant's professional care as of that time. The point is not, as defendant urges, that the stipulation of facts (see fn. 3, *ante*) removed any issue about his having been shown a lump in 1965: it is, rather, that at one time he may have panicked or thought it expedient to lose any written record of the occasion.[7]

Thus, a ruling which originally was based on a justifiably mistaken interpretation of the scope of defendant's admission of negligence, ripened into an abuse of discretion when persisted in after the ephemeral nature

---

[7]Throughout the trial plaintiff's counsel kept pointing to defendant's alleged omission of the diagram of the lump on the copied record as the basic reason why the suppressed evidence was admissible on the merits and to impeach defendant. The defense had little trouble in neutralizing that argument by pointing to the stipulation that defendant had observed a lump in 1965. (See fn. 3, *ante*.) Undoubtedly the court was, at least in part, misled by this overemphasis of the "lost diagram" issue: plaintiff could have been mistaken in her assumption that the diagram was actually drawn on a piece of paper which was part of the lost records; indeed, she could have been disbelieved altogether, yet the fact would have remained that defendant could not produce his original clinical records and had a shaky explanation for his inability. Nevertheless, it cannot be said that plaintiff's counsel failed to preserve his more fundamental point for this appeal. While he, too, was slow to realize the full implications of the defense strategy, when he finally made an often deferred formal offer of proof, he did point out that the exclusionary ruling not only prevented him from showing that defendant suppressed an isolated fact, later admitted, but that it prohibited him from offering more diffuse but perhaps more damaging proof on the entire issue of negligence in 1965, which was never admitted. Thus he argued: "They have admitted the allegations of Paragraph 15, but not Paragraph 16. I would like to show this to the Court, and this is what worries me. If I may show the Court the allegations of Paragraph 16. I think if those were admitted, then I think the admission would be clear, and I think the defense—Frankly, I would have to agree with the defense position, but they have admitted only half the allegations of negligence. They haven't admitted that he was negligent in failing to take out the lump, and that is my whole problem. If they admit that he was negligent for failing to take out the lump, then we could argue this proximate cause thing, and I wouldn't feel as exposed as I am now. But they have only admitted—perhaps I should have brought this out in the beginning, but I just assumed that it would be clear that after I produced more evidence, I would be permitted to do it."

of that admission in the light of the factual conflict on causation became apparent. With negligence effectively denied until some point during defendant's treatment of plaintiff when the jury could find that even on plaintiff's experts' theory of causation it was too late to prevent any harm, defendant's inability to produce his original clinical records—unless explained—assumed a probative value which outweighed any prejudicial effect. To be sure, the evidence was damaging, but "prejudice and detriment are not synonymous." (*Gonzales* v. *Brennan,* 238 Cal.App.2d 69, 76 [47 Cal.Rptr. 501].) As the cases show, a trial court's discretion to exclude probative evidence under section 352 of the Evidence Code is not unlimited. (*People* v. *Mascarenas,* 21 Cal.App.3d 660, 667 [98 Cal. Rptr. 728]; *Roemer* v. *Retail Credit Co.,* 3 Cal.App.3d 368, 373 [83 Cal.Rptr. 540].)

We need not go any further to dispose of this appeal. The parties' briefs and arguments do, however, reveal a certain amount of confusion on the entire issue of the effect to be given to evidence of "spoliation"; since at the retrial the issue may again arise on a more complete admission of negligence, we add the following observations for the guidance of all concerned.

The basic principle is explained by Wigmore: "It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's . . . suppression of evidence by . . . spoliation . . . , is receivable against him as an indication of his consciousness *that his case is a weak or unfounded one;* and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not apply itself necessarily to any specific fact in the cause, but operates, indefinitely though strongly, *against the whole mass of alleged facts constituting his cause.*" (2 Wigmore, Evidence (3d ed. 1940) § 278, p. 120. Italics added.) Again: "But so far as spoliation or suppression partakes of the nature of a *fraud* [italics in original], it is open to the larger inference already examined (*ante,* § 278), namely, a consciousness of the *weakness of the whole case.* [Italics added.]" (*Ibid.,* § 291, p. 187.)

Even Professor McCormick, who in other respects thinks that Wigmore's view concerning the effect of suppression of evidence by a party goes too far (McCormick on Evidence (2d ed. 1972) § 273, p. 662, fn. 70) agrees that the proponent of such evidence—plaintiff, in this case—should be entitled to an instruction that "the adversary's conduct may be considered as tending to corroborate the proponent's case *generally,* and as tending to discredit the adversary's case *generally.*" (*Ibid.,* p. 661. Italics added.)

If evidence of spoliation affects "the whole case"—Wigmore—or each

party's case "generally"—McCormick—, it is erroneous to suggest as defendant did below that by admitting one issue out of several, the effect of spoliation is neutralized.

If defendant destroyed the records under a "consciousness of guilt" why should we assume that such consciousness was irrelevant on the issue of causation? What justifies a belief that his feeling of guilt was provoked only by professional embarrassment over the fact that he had been negligent? Is it not just as reasonable to assume that he had a bad conscience because as a result of that negligence his patient had been caused to suffer harm? Carried to its logical conclusion, defendant's position is that section 413 of the Evidence Code is not applicable whenever any issue which could be litigated is admitted. (See generally, *Handley* v. *Guasco,* 165 Cal. App.2d 703, 709 [332 P.2d 354]; *Ross* v. *Railways Co.,* 47 Cal.App. 753, 767-768 [191 P. 703].)

 ██ ██ If, at a retrial, a more adequate admission of negligence is made, any renewed appeal to the court's discretion under section 352 should be considered under the principles we have summarized.[8]

The judgment is reversed.

Stephens, J., and Hastings, J., concurred.

A petition for a rehearing was denied May 3, 1974, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied June 5, 1974.

---

[8]There are, of course, many factors which a trial court must consider when it is requested to exercise its discretion to deprive a party of probative evidence. Among these are: first, a determination that the evidence is relevant to an issue that is in dispute; second, a consideration of other proof on that issue available to the party which offers the evidence; and, third, that party's relatively greater need for the evidence if it must carry the burden of proof on the issue to which the evidence relates.

At the trial below, both parties requested the court to instruct the jury that plaintiff had the burden of proof on the issue of causation. Therefore, no question concerning the propriety of thus imposing the burden is before us. Yet, it seems clear that at least from the moment that the defense theory on causation became apparent, a question arose whether this case called for the application of the principle of *Haft* v. *Lone Palm Hotel,* 3 Cal.3d 756, 769-775 [91 Cal.Rptr. 745, 478 P.2d 465], "that when there is a substantial probability that a defendant's negligence was a cause of an accident, and when the defendant's negligence makes it impossible, as a practical matter, for plaintiff to prove 'proximate causation' conclusively, it is more appropriate to hold the defendant liable than to deny an innocent plaintiff recovery, unless the defendant can prove that his negligence was *not* a cause of the injury." (*Id.* p. 774, fn. 19; italics in original.)

There may be medical as well as legal reasons why this rule does not apply here. We merely point out that any future exercise of discretion under section 352 with respect to the evidence concerning defendant's loss of his records, should be exercised with the burden of proof on causation in mind. (See *Harris* v. *Irish Truck Lines, Inc.,* 11 Cal.3d 373 [113 Cal.Rptr. 489, 521 P.2d 481].)