Gary and Beverly SWEET, Individually and as Parents and Next Friend of their Minor Son, Jacob Sweet, Appellants,

v.

SISTERS OF PROVIDENCE IN WASH-INGTON, a Washington non-profit cor-poration, d/b/a Providence Hospital; Daniel Tulip, M.D., James Nesbitt, M.D., Gerry J. Schriever, M.D.; the Children's Clinic, Inc., a corporation; the Chil-dren's Clinic, a partnership; and Does 1 through 10, partners in the Children's Clinic, Inc., Appellees.

No. S–4830.

Supreme Court of Alaska.

Sept. 30, 1994.

Patricia L. Zobel and John T. Robertson, Staley DeLisio & Cook, Anchorage, for appellants.

James D. Gilmore, Gilmore & Doherty, Anchorage, for appellee Sisters of Providence in Washington.

David F. Leonard and Marcus R. Clapp, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellees Daniel Tulip, M.D., James Nesbitt, M.D., and The Children's Clinic.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

### OPINION

MOORE, Chief Justice.

Jacob Sweet, an infant, allegedly sustained brain damage while a patient at Providence Hospital in Anchorage. Jacob's parents, Gary and Beverly Sweet (the Sweets), brought this action against Providence Hospital (Providence) and Drs. Daniel Tulip, James Nesbitt, Gerry J. Schriever and the Children's Clinic (collectively referenced as "the doctors"), claiming that the defendants' negligence caused Jacob's severe brain injury. The Sweets also alleged that Providence's inability to locate certain medical records precluded them from proving medical negligence, and that they were entitled to recover based on a claim of intentional or negligent spoliation of evidence.

The jury's verdict was in favor of the defendants on all claims. The Sweets' appeal addresses five main points of error. We reverse and remand for a new trial based on the trial court's failure to apply a rebuttable presumption of negligence and causation on the Sweets' medical negligence claim, and the court's failure to hold an evidentiary hearing as to whether an administrative regulation should set the standard of care on the Sweets' informed consent claim. We find no error in the court's handling of issues related to the expert witnesses, and we vacate the court's attorney's fee award.

### I.

Jacob Sweet is a young boy with a severe brain injury. He suffers from profound mental retardation as well as cerebral palsy and blindness. Jacob is confined to a wheel chair, and he will almost certainly continue to depend upon around-the-clock care for the rest of his life. The cause of Jacob's disabilities is the subject of this lawsuit.

Jacob was born to Beverly and Gary Sweet on January 16, 1986, at Providence. Upon Jacob's birth, Dr. Tulip, an employee of the Children's Clinic, became his pediatrician.[1] Dr. Tulip examined Jacob shortly after his birth and found nothing abnormal about the infant's health.

The next day, Dr. Nesbitt, another Children's Clinic physician, circumcised Jacob.[2] The parties dispute whether either Dr. Tulip or Dr. Nesbitt advised Beverly Sweet of the risks and benefits of circumcising Jacob. The Sweets contend that they were never advised they had any choice in deciding whether Jacob should be circumcised. They state that, after Dr. Tulip's examination of Jacob on the 16th, Nurse Marianne Rexford presented Beverly with an index-size permit card to authorize circumcision. Beverly stated that she had not discussed circumcision with her husband or any physicians, but she signed the authorization because she believed that all baby boys were circumcised, and she was not aware she had a choice in the matter.

Neither Nurse Rexford nor the doctors have any independent recollection of talking with Beverly about Jacob's circumcision. However, both Dr. Tulip and Dr. Nesbitt contend that, prior to circumcising Jacob, they certainly would have separately discussed the risks of circumcision with Beverly as part of their usual practice in caring for newborn boys. They also state that, as part of the usual practice of Providence's nursery staff, Nurse Rexford or another nurse would have provided Beverly with a document called the "Compton Sheet," which describes in detail the risks and benefits of, and alternatives to, circumcision.

Jacob and Beverly were discharged from the hospital on January 18, 1986. Over the next week, Gary and Beverly followed the instructions they were given on how to care for the circumcision site. On Saturday, January 25, one week after Jacob's discharge, the Sweets called Dr. Tulip because Jacob had become fussy and was vomiting. Bever-

---

1. On the date of Jacob's birth, Drs. Nesbitt and Schriever, who are board certified pediatricians, owned the Children's Clinic. Dr. Tulip was not board certified at the time and was an employee of the Clinic. The Clinic expected Dr. Tulip to perform according to the same standard of care required of a board certified pediatrician.

2. Dr. Nesbitt performed the circumcision because Dr. Tulip did not do circumcisions at that time. Following the circumcision, Dr. Nesbitt was not involved in Jacob's care.

ly had also noticed that Jacob's circumcision site appeared red and swollen and looked different from the picture on the brochure outlining the proper care of the site.

Dr. Tulip advised the Sweets to bring Jacob to Providence, where he would meet them. Dr. Tulip met the Sweets in the Emergency Room at approximately 11:00 p.m. Dr. Tulip examined Jacob and determined that he had a localized infection in his penis. Recognizing that infants are at higher risk of developing potentially life-threatening systemic, or generalized, bacterial infections of the entire body, Dr. Tulip decided the most prudent approach was to admit the infant overnight to the pediatrics ward so that he could receive IV antibiotic therapy.

There are numerous critical facts at issue regarding Jacob's condition and treatment between the time he was admitted to the pediatrics ward and the time he was transferred to the neonatal intensive care unit (NICU) approximately 26 hours later, at 2:15 a.m. on Monday, January 27. In addition to the recollections of the parties, a number of different medical records exist which set forth some specifics regarding Jacob's care during this 26 hour period. These records include Dr. Tulip's notes regarding Jacob's care, Dr. Roy Davis' notes following Jacob's prolonged seizure, or "crash," late in the evening of January 26, all laboratory test results over the course of Jacob's stay at Providence, his NICU records, physician's orders, discharge summary and radiology and EEG reports.

Other medical records are missing and could not be located after an exhaustive search by the parties. The missing records include Jacob's narrative nursing notes, a medication sheet, a graphic record, and a nursing care flow sheet for Sunday, January 26 (collectively referenced as "the nursing records"). The narrative nursing notes typically would reflect the nurses' assessments of the patient, detailed observations which are updated every four hours, any communications with the patient's parents or doctors, and the records of treatment and doctor visits. These notes have been called the "eyes and ears of the doctor." The medication sheet would indicate all medication

given to the patient, including the dose, sequence and time given. The sheet would provide evidence as to whether and when a doctor's orders were actually carried out. The graphic record contains information regarding body temperature, pulse, respiration, blood pressure, body weight and all bodily inputs and outputs. The nursing care flow sheet records matters such as the patient's appetite and the amount of formula consumed.

The missing nursing records are the subject of the Sweets' cause of action against Providence for spoliation of evidence. It is undisputed that the records were available at the time Jacob was transferred to NICU. There is no contention that the records were missing during any critical moments of Jacob's stay, or that his care was adversely affected as a result of absent records. The Sweets claim that the missing records precluded them from succeeding on their medical negligence claims, and that as a result they were entitled to a conclusive presumption of negligence.

*Events over the course of Sunday, January 26*

Given the lack of nursing records setting forth the precise nature and timing of events during the day of January 26, the parties dispute a number of facts. The Sweets contend that Beverly returned to Providence the morning of Sunday, January 26 at approximately 8:00 or 8:30 a.m. While holding Jacob, Beverly noticed what she called a "stiffening spell" in which Jacob forcefully arched his back, rolled his eyes and turned red in the face. The spell lasted a few seconds. Beverly stated that she suspected the spell was caused by Jacob's pain in urinating, and that she reported it to the nurse. She also reported it to Dr. Tulip when he came in at approximately 10:00 a.m.

According to the Sweets, after Dr. Tulip left the room, Beverly observed two more stiffening spells and noticed that Jacob appeared to be shivering. She reported this to the nurse on duty, and again to Dr. Tulip when he returned at noon. As the afternoon progressed, Beverly stated the stiffening spells became more frequent, occurring ap-

proximately every 45 minutes to an hour between the hours of 2:00 p.m. and 9:00 p.m. She remembers describing these episodes to the nurse on duty at around 3:00 p.m.

The Sweets contend that, at around 7:00 p.m., Gary called for the nurse when Jacob had a stiffening spell while being held by Gary. According to the Sweets, the nurse asked if Jacob had been fluttering his eyes during the spell. When Gary responded that he had, the nurse said she would call the doctor immediately.

Dr. Tulip testified that he felt Jacob's condition on Sunday morning was improved from that of the night before. He recalled that Beverly informed him of a movement that troubled her when he visited Jacob around noon. He otherwise did not recall that anyone informed him of Jacob's "stiffening spells" between Sunday morning and Sunday evening.[3] However, Dr. Tulip stated that he became aware during his noon visit that Jacob had lost interest in feeding and that his temperature had dropped. As a result of this information, Dr. Tulip stated that he ordered lab tests to investigate the possibility that Jacob had a systemic infection.

Dr. Tulip denied receiving a call from a nurse at 7:00 p.m. informing him of Jacob's possible seizures. He remembered receiving a call at around 9:00 p.m. in which the nurse reported two movements that she thought were normal infant movements. Nonetheless, Dr. Tulip stated that in response he ordered three procedures to ensure that Jacob's condition was stable. He ordered that (1) an apnea monitor be attached to Jacob to detect Jacob's heartbeat and respiration, and to notify the nurses if there was a delay between breaths or a drop in heart rate below certain intervals; (2) Jacob's IV fluids be increased; and (3) an electroencephalogram ("EEG") be performed the next morning to monitor Jacob's brain activity for possible indication of seizures.

The Sweets allege that, after an apnea monitor was attached to Jacob, its alarm

sounded several times, each correlating with a stiffening spell. However, the nurse on duty simply turned down the buzzer because it was disturbing other patients. Moreover, they claim that at 11:30 p.m., Nurse Dawn Pope discovered that Jacob's IV was not working. Without the nursing records, it is impossible to tell how long the IV had been inoperative before Nurse Pope became aware of it. The Sweets assert that Nurse Pope did not return to restart the IV until shortly after 1:00 a.m., so it was not functioning for at least an hour and a half.

At around midnight, Dr. Tulip reviewed Jacob's chart and ordered lab tests for the following morning. He later crossed out that order and requested immediate tests. He also ordered that Jacob's IV flow rate be increased. The Sweets contend that, although Nurse Pope became aware of this order at 12:30, she did not immediately restart the IV even though it had not been operating for at least an hour.

### The Crash

Around 1:00 a.m. on January 27, Jacob experienced what the parties refer to as "the crash." Again, however, their recollection of events differs substantially. The Sweets allege that Dr. Tulip entered Jacob's room around 1:00 a.m. and told Beverly that Jacob was "a sick little boy." He stated he wanted to take a spinal tap and would move Jacob to a treatment room for that purpose. According to the Sweets, once Jacob was in the treatment room, he had another stiffening spell, which Dr. Tulip recognized as a seizure. Dr. Tulip immediately treated the situation as an emergency and requested that Dr. Roy Davis, a neonatologist who was in the hospital, be called in to assist. Beverly testified that she told Dr. Tulip that Jacob had been making the same movements all day.

Dr. Tulip remembers events differently. He recalled that, around 1:00 a.m., he was examining Jacob in Jacob's room. At that time, he saw Jacob have a seizure. He then

---

**3.** Testifying about Beverly's descriptions of Jacob's movement with the benefit of hindsight, Dr. Tulip stated that the "shivering spells" were probably seizures. Dr. Tulip testified that seizures in infants are subtle and hard to identify, particularly when observed by a lay person who is only relaying information to medically trained persons.

moved Jacob into the treatment room, where Jacob had a second prolonged seizure known as the "crash."

Once Jacob began having his prolonged seizure in the treatment room, Dr. Tulip attempted to restart Jacob's IV so that anti-convulsant medication could be administered. When Dr. Davis arrived several minutes later, Jacob was being given oxygen by mask and bag, and he was blue and mottled in color. Dr. Davis therefore established a first priority of intubating Jacob so that he could be artificially respirated. The next priority was to restart the IV, which was achieved with some difficulty. Jacob was then given blood volume to relieve shock and anti-convulsant medication through the IV.

Within a minute or two after the medications were administered, the seizure was controlled. Since Jacob was in the treatment room for about an hour, the seizure may have lasted from twenty minutes to one hour. Dr. Tulip estimated it lasted between twenty and forty minutes. Throughout the prolonged seizure, the doctors contend that Jacob's heartbeat did not stop, he was never in shock, he was not dehydrated, and he never lapsed into a coma. They assert that the seizure did not result in any permanent brain damage.

Around 2:15 a.m., Jacob was transferred to the NICU. Although Jacob continued to have seizures in the NICU, the doctors stated that he recovered quickly. He was discharged from the hospital on February 9, and examined again by Dr. Tulip on February 14. Although Dr. Tulip noted that Jacob was at risk for developmental delays, he was not aware of Jacob's significant brain damage until after this lawsuit was filed.

*Course of Proceedings*

In 1987, the Sweets filed suit against Providence and the doctors.[4] The Sweets alleged that the defendants had failed to obtain their informed consent before circumcising Jacob. They further alleged that the defendants were medically negligent in failing to adequately monitor Jacob's condition and to promptly diagnose and treat his bacterial

infection and seizures, which resulted in his brain damage. The Sweets claimed that the infection from Jacob's circumcision site led to a generalized systemic infection or to meningitis, which directly or indirectly caused his brain damage. Upon discovering that Jacob's nursing records were missing, the Sweets later amended their complaint to include allegations of intentional and/or negligent spoliation of evidence against Providence.

At trial, the Sweets' experts testified that Jacob's brain damage was the result of hypoxic ischemia, or reduced blood flow coupled with reduced oxygen in the blood supply, during Jacob's prolonged seizure in the treatment room. They opined that Jacob's seizures, and his "crash," were caused by a systemic bacterial infection seeded from Jacob's circumcision site. Moreover, they testified that, regardless of whether Jacob's seizures were caused by a systemic bacterial infection arising from his circumcision site or by some other cause such as viral infection, Jacob's injury would have been avoided if the infant had been promptly transferred to NICU where his seizures would have been observed and controlled before the crash, thereby avoiding any brain injury. The Sweets' experts also contended that, had Providence personnel restarted Jacob's IV in a reasonable amount of time on the night of January 26, it would have been operable at the time of the crash, and Jacob's prolonged seizure would have been controlled before any brain damage occurred.

The defendants argued that Jacob's seizures were not caused by a systemic infection seeded from his circumcision site, and that his prolonged seizure did not cause him to stop breathing long enough to result in his significant brain damage. Although the defense experts believed that the cause of Jacob's disabilities could not have been hypoxic ischemia, they did not necessarily agree as to what did cause his injuries. The most prevalent theory amongst the defense experts was that a viral infection was at fault.

The jury rendered a verdict in favor of Providence and the doctors as to all issues.

---

**4.** Dr. Schriever was dismissed as a party defendant prior to trial.

The trial court subsequently entered judgment against the plaintiffs and awarded Providence and the doctors $150,000 each in attorney's fees. Following this court's decision in *Bozarth v. Atlantic Richfield Oil Co.*, 833 P.2d 2 (Alaska 1992), the trial court reconsidered its attorneys' fee order, but it later upheld its original awards.

## II.

On appeal, the Sweets allege that the trial court erroneously (1) handled their spoliation of evidence claims against Providence; (2) instructed the jury regarding their claim of lack of informed consent to the circumcision; (3) permitted an excessive number of defense experts to testify; (4) refused to allow the Sweets to cross-examine certain defense experts using deposition testimony of other, non-testifying defense experts; and (5) awarded excessive attorney's fees.

### A. *SPOLIATION OF EVIDENCE*

The Sweets contend that Providence's spoliation of evidence stripped them of their ability to successfully prosecute their medical negligence causes of action against Providence and the doctors. On appeal, they claim that Providence breached its duty to create and preserve three types of required medical records: (1) signed informed consent records regarding the circumcision performed on Jacob;[5] (2) the nursing records for January 26; and (3) a contemporaneously created record of Jacob's "crash" in the treatment room. The Sweets argue that Providence's breach of duty with respect to these records impaired their ability to prove medical negligence, and they were entitled to judgment as a matter of law on their spoliation claims.

To account for the missing nursing records, Judge Shortell shifted the burden of proof to Providence on the issues of its duty and breach in providing medical care to Jacob. However, the burden remained on the Sweets to establish that any medical negligence was the legal cause of Jacob's injuries. The court additionally instructed the jury regarding negligent and intentional spoliation

of evidence and allowed the jury to determine whether the missing records rendered the Sweets unable to pursue their negligence claims.

We address the questions arising from the Sweets' claims of error on this issue as follows:

1. *The trial court erred in refusing to shift the burden of proof as to causation on the Sweets' medical negligence claim.*

■ As discussed above, Judge Shortell shifted the burden of proof to Providence on the issues of its duty and breach on the Sweets' medical negligence claim. However, the court refused to shift the burden of proof as to causation. The burden remained on the Sweets to establish that medical negligence was the legal cause of Jacob's injuries. The Sweets argue that Providence should have borne the burden of proving that Jacob's injuries were not caused by the hospital's negligence. We agree.

Just as the missing records may have impaired the Sweets' ability to prove medical negligence, they would in the same way impair the Sweets' ability to prove a causal connection between any negligence and Jacob's injuries. It is for this very reason that a number of courts in other jurisdictions have created a rebuttable presumption shifting the burden of persuasion to a health care provider who negligently alters or loses medical records relevant to a malpractice claim. *See Welsh v. United States*, 844 F.2d 1239, 1246–47 (6th Cir.1988); *Public Health Trust v. Valcin*, 507 So.2d 596, 599–601 (Fla.1987); *Bondu v. Gurvich*, 473 So.2d 1307, 1313 n. 5 (Fla.Dist.App.1984); *Thor v. Boska*, 38 Cal. App.3d 558, 113 Cal.Rptr. 296, 303 n. 8 (1974) (dicta); *see also DeLaughter v. Lawrence Cty. Hosp.*, 601 So.2d 818, 821–22 (Miss.1992) (imposing presumption that missing records would contain evidence unfavorable to the hospital).

■ While the cases cited above each involve different nuances, we believe that the appropriate approach is that announced by the Florida Supreme Court in *Valcin*, 507

---

**5.** The informed consent issue is addressed separately *infra* at II.B.

So.2d at 599–601. In *Valcin,* the plaintiffs claimed that a surgeon negligently performed a tubal ligation. However, the lack of an operative report by the surgeon impaired the plaintiffs' ability to prove negligence. *Id.* at 597. The Florida Supreme Court approved of the trial court's use of a rebuttable presumption shifting the burden of producing evidence to the hospital. *Id.* at 599. In reaching this result, the court made several observations with which we agree.

First, the court required a preliminary determination of the potential importance of the missing records before burden shifting should take place: "[W]e point out that upon remand the trial court should consider the existence or adequacy of any operative note ... and determine whether or not the absence of an adequate note sufficiently hinders plaintiff's ability to proceed, thus shifting the burden of producing evidence on the merits of the claim."[6] *Id.* at 601. The court relied on Alaska authority in establishing this requirement:

> In other words, a plaintiff must first establish to the satisfaction of the court that the absence of the records hinders his ability to establish a prima facie case. In *Patrick v. Sedwick,* 391 P.2d 453, 457 (Alaska 1964), for example, the Alaska Supreme Court noted that "it was incumbent upon the appellee surgeon to have described accurately and fully in his report of the operation everything of consequence that he did and which his trained eye observed during the operation.... If these requirements had been met the report would ... more likely ... have supplied sufficient facts to have permitted expert witnesses to testify on the question of negligence."

*Id.* at 599.

Second, the *Valcin* court noted that burden shifting should only occur when the essential medical records are missing through the negligence or fault of the adverse party. *Id.* In this regard we conclude that the Sweets had established the applicability of the doctrine of negligence per se.

■ In *Ferrell v. Baxter,* 484 P.2d 250 (Alaska 1971), this court set forth the factors to guide the trial court in determining whether the violation of a statute or regulation supports a finding of negligence per se. *See also Bachner v. Rich,* 554 P.2d 430, 440–41 (Alaska 1976). In doing so, we adopted the rules set forth in the Restatement (Second) of Torts §§ 286, 288A and 288B (1965). *Ferrell,* 484 P.2d at 263. Under the Restatement approach, the trial court must first determine whether the conduct at issue falls within the scope of the statute or regulation by applying the criteria set out in Restatement § 286.[7]

■ In the present case, the trial court properly ruled that Providence had a duty to maintain Jacob's nursing records. This duty is established by statute and regulation, as well as by the Joint Commission on the Accreditation of Hospitals (JCAH), the accrediting commission for Providence. *See* AS 18.20.085 (requiring records retention); 7 Alaska Administrative Code 12.770(c)(6), (d) (requiring hospitals to keep medical records, including nurses' notes, and to protect against their loss); 42 C.F.R. 482.24 (1992) (requiring retention of medical records, including nursing notes); 1986 JCAH Accreditation Manual for Hospitals. These provisions are explicit that such records shall be prepared and maintained, and they are sufficient to set the standard of care. From the JCAH Accreditation Manual, it is clear that one of the purposes of the records retention requirement is "[t]o assist in protecting the

---

**6.** This determination of the relevance of the missing records is a threshold finding to be made by the trial court.

**7.** Section 286 provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

    (a) to protect a class of persons which includes the one whose interest is invaded, and
    (b) to protect the particular interest which is invaded, and
    (c) to protect that interest against the kind of harm which has resulted, and
    (d) to protect that interest against the particular hazard from which the harm results.
Restatement (Second) of Torts § 286 (1965); *see also Ferrell,* 484 P.2d at 263.

legal interest of the patient, the hospital, and the practitioner responsible for the patient." 1986 JCAH Accreditation Manual § 9.1.2.4. We conclude that the statute and regulations mandating medical records retention also were designed in part to prevent the loss of evidence potentially essential to the pursuit or defense of a medical malpractice claim. Cf. *Rodgers v. St. Mary's Hospital*, 149 Ill.2d 302, 173 Ill.Dec. 642, 645, 597 N.E.2d 616, 619 (1992) (state x-ray retention act which specifically addressed potential litigation was designed to protect patient's legal interests).[8]

█ Based on the above, we believe that the trial court erred in determining that the doctrine of negligence per se was not applicable. However, we note that on remand, the jury must be permitted to assess Providence's argument that its violation of the records retention requirement was excused. See *Ferrell*, 484 P.2d at 263–64 (adopting the Restatement (Second) of Torts § 288A); Restatement (Second) of Torts § 288A(2)(c) (the violation of a legislative enactment is excused when the actor is unable after reasonable diligence or care to comply). Providence bears the burden of affirmatively proving the defense of excuse. *Ferrell*, 484 P.2d at 266.

Third, the *Valcin* court also noted that the presumption created by burden shifting is rebuttable, but it is not a "vanishing presumption." *Valcin*, 507 So.2d at 600–01. As the court stated:

> If the plaintiff is in fact sufficiently "hindered" by the absence of an operative note, odds are that the defendant's production of some evidence of nonnegligence will not place the plaintiff in a better position. Testimony based on the selective recollections of the surgeon and his staff would be considered "substantial" enough to "burst the bubble," thus keeping the presumption from the jury. Plaintiff could rarely prove negligence by a preponderance of the evidence when the presumption has given him nothing more than the self-serving testimony of the defendant.

*Id.* at 600 (citations omitted). Instead, the type of rebuttable presumption which should

apply "affects the burden of proof," shifting the burden to the party against whom the presumption operates to prove the non-existence of the fact presumed. *Id.* at 601. The *Valcin* court continued:

> "When evidence rebutting such a presumption is introduced, the presumption does not automatically disappear. It is not overcome until the trier of fact believes that the presumed fact has been overcome by whatever degree of persuasion is required by the substantive law of the case." Rebuttable presumptions which shift the burden of proof are "expressions of social policy," rather than mere procedural devices employed "to facilitate the determination of the particular action."
>
> [This type of] presumption shifts the burden of proof, ensuring that the issue of negligence goes to the jury. This interpretation appears to best implement public policy that adequate operative notes be kept.

*Id.* at 600–601 (quoting *Caldwell v. Division of Retirement*, 372 So.2d 438, 440 (Fla.1979)).

Applying these observations to the present case, we hold that the trial court should have adopted a rebuttable presumption that Providence was medically negligent in treating Jacob and that this negligence legally caused Jacob's injuries, absent a jury finding that Providence's failure to maintain Jacob's records was excused. Based on the record, there can be no question that the January 26 nursing records would contain material and substantial evidence of Providence's conduct with respect to Jacob. The absence of this information clearly hinders the Sweets' ability to proceed. Further, Providence bore the responsibility of preserving Jacob's records. Consequently, a presumption of its negligence and causation was justified. This presumption may be rebutted by a preponderance of the evidence showing that Providence was not negligent in treating Jacob or that any such negligence did not cause Jacob's brain damage.

---

8. Notably, Providence has not disputed its duty to maintain Jacob's nursing records. Rather, Providence argued that it exercised reasonable

diligence to maintain the nursing records and that the records were not lost as a result of its negligence.

As a practical matter, then, the jury must first assess Providence's excuse for the lost records. If Providence does not establish that its loss of the records was excused, the jury instructions must reflect that the burden remains on Providence to affirmatively disprove medical negligence and causation. If, on the other hand, the jury is satisfied that Providence's failure to maintain the nursing records was excused, the jury instructions should reflect that the Sweets bear the burden of proving that the defendants committed medical negligence, and that such negligence legally caused Jacob's injuries.[9]

### 2. Shifting the burden of proof makes it unnecessary to separately instruct on the tort of spoliation.

■ We next deal with issues concerning the Sweets' independent tort claim of spoliation. We recognized the tort of spoliation relating to the intentional destruction of records in *Hazen v. Municipality of Anchorage*, 718 P.2d 456 (Alaska 1986). *Hazen* relied strongly on *Smith v. Superior Court*, 151 Cal.App.3d 491, 198 Cal.Rptr. 829 (1984), the leading case on intentional spoliation of evidence. *See* Pati Jo Pofahl, Note, *Smith v. Superior Court: A New Tort of Intentional Spoliation of Evidence*, 69 Minn.L.Rev. 961 (1985). As the *Smith* case makes clear, the tort of intentional spoliation is a tort borne of necessity: "for every wrong there is a remedy." *Smith*, 198 Cal.Rptr. at 832.

Although there are certainly cases like *Hazen* which merit a cause of action for intentional spoliation, we do not believe this is such a case. Based on the record, we see insufficient evidence from which a reasonable person could conclude that Providence lost or destroyed Jacob's January 26 nursing records with the intent to disrupt the Sweets' prospective civil action. Accordingly, a jury instruction as to intentional spoliation was not legally supportable, and we consider only the Sweets' claim of negligent spoliation.

In keeping with the *Smith* rationale, a number of other courts have recognized that negligent destruction of records may give rise to an independent tort of spoliation. *See Pirocchi v. Liberty Mutual Ins. Co.*, 365 F.Supp. 277, 280–82 (E.D.Penn.1973); *Velasco v. Commercial Bldg. Maintenance Co.*, 169 Cal.App.3d 874, 215 Cal.Rptr. 504, 506 (1985); *Bondu v. Gurvich*, 473 So.2d at 1313. However, it is our view that, in the present case, the remedy of burden shifting is a sufficient response to the loss or destruction of the records. Other courts have reached the same conclusion. *See, e.g., Miller v. Montgomery County*, 64 Md.App. 202, 494 A.2d 761, 768 (1985) ("[T]he remedy for the alleged spoliation would be appropriate jury instructions as to permissible inferences, not a separate and collateral action.").[10] We need not decide in this case whether the recognition of a separate tort of negligent destruction of evidence would ever be appropriate, for example, against a third party not associated with the underlying lawsuit. We are satisfied that an adequate remedy for the spoliation of Jacob's records is provided by the burden shifting discussed in part 1, above.

## B. INFORMED CONSENT

■ Alaska Statute 09.55.556 sets forth the elements of a cause of action regarding informed consent. It states in part:

*Control of the Destruction of Evidence*, 36 Emory L.J. 1085 (1987) (discussing alternative to spoliation tort); Comment, Philip A. Lionberger, *Interference with Prospective Civil Litigation by Spoliation of Evidence: Should Texas Adopt a New Tort*, 21 St. Mary's L.J. 209, 216–229 (1989) (discussing treatment of spoliation of evidence in jurisdiction not adopting a separate tort and noting alternative remedies available); Abney, *Spoliation & Future Civil Actions: Slowing the Rush to a Novel Tort*, The National Law Journal, Feb. 2, 1987, at 38, col. 1 (arguing that adequate remedies already exist if spoliator is party to the underlying suit).

---

9. The Sweets also argue that Providence breached its duty to create signed inform consent documents and a contemporaneously created record of the "crash" in the treatment room. For purposes of remand, we note that the burden shifting approach outlined above would be equally applicable in the context of the breach of a duty to create records. *See Patrick v. Sedwick*, 391 P.2d 453 (Alaska 1964) (applying rebuttable presumption of negligence where doctor failed to make sufficiently detailed operative notes).

10. For a discussion of the alternatives to adopting a spoliation tort, *see* Lawrence Solum & Stephen Marzen, *Truth and Uncertainty: Legal*

(a) A health care provider is liable for failure to obtain the informed consent of a patient if the claimant establishes by a preponderance of the evidence that the provider has failed to inform the patient of the common risks and reasonable alternatives to the proposed treatment or procedure, and that but for that failure the claimant would not have consented to the proposed treatment or procedure.

The Sweets assert that administrative regulations promulgated by the Alaska Department of Health and Social Services clarify that informed consent requires *signed* informed consent.[11] Because Providence and the doctors did not obtain signed informed consent documents prior to circumcising Jacob, the Sweets claim the defendants were negligent per se. The trial court rejected the Sweets' argument that the regulation set the appropriate standard of care for tort liability purposes. We reverse the court's ruling as insufficiently supported by the evidence, since the court did not hold an evidentiary hearing to establish whether 7 AAC 12.120 was or was not obscure and could be fairly interpreted to set the standard of care.

In determining whether to formulate a negligence per se instruction based on the violation of a statute or regulation, our cases rely on the guidelines set forth in the Restatement (Second) of Torts §§ 286, 288A, 288B (1965). *Ferrell v. Baxter,* 484 P.2d 250, 263–65 (Alaska 1971). Under the Restatement approach, the trial court must make an initial legal determination whether the conduct at issue falls within the scope of the statute or regulation by applying the criteria set out in § 286 of the Restatement. *Id.; State Mechanical, Inc. v. Liquid Air, Inc.,* 665 P.2d 15, 18 (Alaska 1983); *see supra* note 8. If the criteria of § 286 are met, the trial court may adopt the law as the standard of

reasonable behavior. However, under § 286, the trial court retains discretion to refuse to adopt the law as the standard of care. *Ferrell,* 484 P.2d at 263–64; *Bachner,* 554 P.2d at 440–41 & nn. 11–12. For example, rejection of the legislative enactment is appropriate when the law is so obscure, unknown, outdated, or arbitrary as to make its adoption as a standard of reasonable care inequitable. *State Mechanical,* 665 P.2d at 18–19; *Ferrell,* 484 P.2d at 264–65; *see also* Restatement (Second) of Torts § 288A(2)(b) (1965).

The defendants argued to the trial court that 7 AAC 12.120(c) should not define the standard of care because its reference to signed informed consent was obscure and unknown in the medical community. They further argued that the Sweets did not present any evidence in their case-in-chief to justify a negligence per se instruction. As a result, the defendants had not presented any evidence, as they otherwise would have, to show that physicians were largely unaware of the regulation, and that it was not the standard practice to obtain signed informed consent to procedures like circumcisions. For this reason, the defendants argued, it would be inequitable to allow the regulation to define the standard of care.

The court apparently accepted the defendants' arguments without further inquiry. This constituted error. Based on the Sweets' allegations, there was an issue whether the regulation's requirement of signed informed consent was in fact obscure and unknown. Because the trial court did not adequately investigate this issue in an evidentiary hearing, there was an insufficient factual basis from which to conclude that the regulation either was or was not obscure and whether it could be fairly interpreted to set the standard of care. Accordingly, we re-

11. The Department of Health and Social Services' regulations pertaining to General Acute Care Hospitals include one reference to signed informed consent. That regulation states in part:

**7 AAC 12.120. SURGICAL SERVICE.**

. . . .

(c) Before a surgical procedure begins, either the surgeon or the person responsible for administering anesthesia, and the surgical supervisor or his designee shall confirm the pa-

tient's identity and the site and side of the body to be operated upon, and ascertain that the patient's medical record contains a complete history and physical examination for the current admission, appropriate current screening tests based on the needs of the patient, *and signed informed consent for the surgery.* In the case of an emergency, the history and physical examination requirements are waived.

7 AAC 12.120(c) (emphasis added).

verse the court's ruling on this issue and remand for an evidentiary hearing.

## C. *NUMBER OF EXPERT WITNESSES AND JURY CONFUSION* [12]

■ Prior to trial, the court determined that there was adversity of interest between Providence and the doctors, and they therefore should be treated as separate defendants. As a result, each defendant was permitted to call its own expert witnesses. The Sweets argue on appeal that Providence and the doctors shared common interests, and they joined together to form a single defensive unit. Accordingly, the court should have limited their number of experts regarding the standard of care and causation. The Sweets additionally argue that the defendants' experts as to causation served more to confuse than to assist the jury, because they offered conflicting views as to the cause of Jacob's brain damage. We reject both claims of error.

The Sweets rely on Alaska Evidence Rule 702 to support their contentions. The rule provides:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> (b) No more than three expert witnesses may testify for each side as to the same issue in any given case, unless the judge permits an additional number of witnesses to testify as experts.

### Number of Experts

Long before the trial in this case, the Sweets moved to limit or strike some of the experts designated on the defendants' preliminary witness lists. During trial, the Sweets apparently renewed their motion. Following a discussion of the issue, counsel for the defendants asserted that a number of the experts on their lists would not be called at trial. With that assurance, the court determined that it could address this issue as the trial proceeded, and it would limit the defendants' experts only if it saw undue repetition in their testimony. The court also noted that there would be no repetition problem if a number of experts testified only to the limited areas within their particular specialties. In this conference, the court referenced Evidence Rule 702(b) and properly noted that it had discretion to allow more than three experts per issue.

Over the course of the trial, the defendants jointly called eleven physician expert witnesses regarding causation and the standard of care. The plaintiffs called five physician experts on those issues. During the trial, the court did not step in to limit any repetitious expert testimony presented by the defendants, nor do the Sweets cite to any place in the record where they requested that the court do so.[13]

Standing alone, the disparity in numbers of experts does not establish an abuse of the court's discretion. Moreover, we see no error in the trial court's decision to allow the defense experts to testify with the warning that the court would not tolerate repetitive testimony. The Sweets have not shown any reversible error on this issue.

### Jury Confusion

■ We similarly reject the Sweets' claim of jury confusion. It is true that defense experts who testified as to causation offered some differing theories regarding what could have, and what could not have, caused Jacob's brain damage. Those witnesses also acknowledged that Jacob's case was an extremely difficult one on which the experts could reasonably differ. In fact, three defense experts could not opine as to the cause of Jacob's brain damage within a

---

12. The trial court's decision to admit expert testimony lies within the court's sound discretion and is reviewable only for an abuse of discretion. *Colt Indus. Operating Corp. v. Frank W. Murphy Mfr.*, 822 P.2d 925, 932 (Alaska 1991); *D.H. v. State*, 561 P.2d 294, 296–97 (Alaska 1977).

13. The only subsequent discussion regarding witnesses cited by the parties involves the question whether testifying experts could be impeached with the opinions of other testifying or nontestifying experts. That issue is addressed separately *infra*.

reasonable degree of medical certainty. However, the other defense experts generally agreed that a form of viral infection most likely caused Jacob's injury. Significantly, each expert testified that the cause of Jacob's problems was probably not hypoxic ischemia, as alleged by the Sweets.

We see no reversible error arising from the partially conflicting views of several experts called by the defendants. This case was a very complicated one, involving a number of theories regarding causation.[14] The defense experts agreed on the crucial issue from the defendants' point of view: that Jacob's injuries did not arise from the causes alleged by the Sweets. This testimony reasonably could have assisted the jury in understanding the evidence and/or in determining the causation question, and meets the standard required by Evidence Rule 702(a). The trial court did not abuse its discretion in refusing to exclude certain experts because they disagreed as to some theories of causation.

### D. CROSS-EXAMINATION OF DEFENSE EXPERTS

■ The Sweets next argue that they should have been permitted to cross-examine the defendants' experts at trial using deposition testimony of any experts listed as trial witnesses by the defendants, regardless of whether those experts were actually called to testify at trial.[15]

In their opening brief, the Sweets frame this issue as one of their right of access to experts designated as trial witnesses. They imply that the court's ruling was based on a determination that the defendants had a proprietary right to their experts' opinions. We clarify that the Sweets were not denied the right to call or rely upon any experts as their own witnesses during their case-in-chief. Rather, the Sweets' complaint is that they were denied free and full use of certain deposition testimony to cross-examine the opposing party's experts.

The defendants responded to the Sweets' proposal by arguing that if the Sweets referenced expert testimony by defense witnesses who were not presented at trial and whose opinions seemed to contradict those of the testifying experts, the jury would be improperly led to believe that the defendants were suppressing adverse evidence. *See Healy v. Counts*, 100 F.R.D. 493, 496 (D.Colo.1984). The defendants also argued that the case would be unduly prolonged because the defendants would then call those experts as witnesses to testify to their full opinions and to clarify that the defendants had nothing to hide.

The trial court ruled that the Sweets *might* be able to cross-examine defense experts with depositions from other defense experts, even if those experts were probably not going to be called at trial, as long as the Sweets laid a proper foundation. To lay an appropriate foundation, the court ruled that the Sweets must request a hearing out of the jury's presence. At that time, the court could weigh the probative value of the deposition testimony at issue against its danger of unfair prejudice or confusion, and against considerations of undue delay and waste of time. *See* Alaska R. Evid. 403. It could also assess whether the testifying witness was aware of the deponent and the deponent's testimony, and whether the witness had relied on that information in drawing his or her conclusions. However, the court was clear that the Sweets could always present any

---

14. As Providence summarizes it, the issues surrounding causation included questions such as whether Jacob's brain damage could have resulted from (1) a systemic bacterial infection seeded from Jacob's circumcision site; (2) a systemic bacterial infection which caused Jacob's seizures which, in turn, caused brain damage; (3) a viral infection; (4) a white brain matter disease or hereditary disease; and (5) Jacob's seizures, independent of hypoxia.

15. The Sweets further contend that at trial they should have been allowed to use certain admissions against the defendants' interests that were made by the defendants' experts in depositions, regardless of whether those experts actually testified at trial. However, the Sweets do not identify which deposition statements constituted admissions against interest, nor do the parties cite to any discussion in the record regarding reliance on certain statements as admissions. It does not appear that the trial court considered this argument or made any ruling on it. Accordingly, this claim is waived.

witness with a hypothetical question based on deposition testimony without identifying the source of the hypothetical opinion, or the fact that it came from an expert retained by the defendants.

In their briefs, the Sweets do not acknowledge the court's ruling requiring a hearing or an evidentiary foundation. They argue that, under Alaska Civil Rule 32(a)(3), they had an unrestricted right to use deposition testimony in cross-examination, and it was error for the court to impose any limitation on that right.[16] We disagree with this view.

It is well established that trial courts have the right to ensure that proffered evidence meets certain legal thresholds before it may be used at trial. For instance, a court may inquire into whether certain evidence is relevant and material, and whether it merits exclusion under Alaska Evidence Rule 403. It is also proper for the court to ensure that foundational requirements will be satisfied. It is entirely appropriate to require a hearing out of the jury's presence to investigate such questions.

In this case, the Sweets' proposed use of limited deposition testimony from defense experts who would not appear at trial presented substantial dangers of unfair prejudice to the defendants, as well as jury confusion, undue delay and waste of time. Without an investigation into the specific testimony to be used for cross-examination, there was also no indication whether the Sweets could lay a proper foundation for the deposition testimony. Accordingly, the trial court properly refused to allow the Sweets unlimited use of certain depositions for cross-examination, but instead required a hearing to assess the specific facts of each situation.

■ In their briefs on appeal, the Sweets do not specifically identify any deposition statements from non-testifying experts that they would have used to cross-examine the defendants' testifying experts. The court stated numerous times that it could not rule definitively to exclude any evidence unless it held a hearing on the precise testimony to be used in cross-examination. Despite this, there is no indication that the plaintiffs ever requested a hearing. For this reason, it is impossible to effectively review the Sweets' claims, and this argument on appeal is waived. *See* Alaska R. Evid. 103(a)(2) (requiring an offer of proof to preserve objection when evidence is excluded from trial); *Adamson v. University of Alaska,* 819 P.2d 886, 889-90 (Alaska 1991) (failure to make an offer of proof constitutes waiver of claim of error).

**E. *ATTORNEY'S FEES*** [17]

■ Following the jury's verdict, Judge Shortell awarded Providence and the doctors partial attorney's fees under Civil Rule 82. He awarded $150,000 to each of the two defendants, plus post-judgment interest.[18] After the dissenting opinion was published in *Bozarth v. Atlantic Richfield Oil Co.,* 833 P.2d 2, 5 (Alaska 1992), the superior court reconsidered the question whether the fee award was so great as to impose "an intolerable burden on a losing litigant which, in effect, denies the litigant's right of access to the courts." *Id.* at 6 (Matthews, J., dissenting). Upon weighing the Sweets' evidence and arguments, the court determined that its original awards did not actually or in effect deny the Sweets access to the courts. The court therefore reinstated its original fee awards.

In light of our rulings on the spoliation and informed consent issues, we vacate the attorney's fee awards. Following the retrial of this case, the revised version of Rule 82 which became effective on July 15, 1993 will govern the attorney's fees to be awarded.

**16.** Civil Rule 32(a)(3) states in part that, subject to the rules of evidence, the deposition of a witness may be used by any party for any purpose, if the court finds that the witness is at a greater distance than 100 miles from the place of trial, or is out of the state.

**17.** This court will review attorney's fee awards for an abuse of discretion. *Malvo v. J.C. Penney Co.,* 512 P.2d 575, 586-87 (Alaska 1973). An abuse of discretion exists when the trial court's determination is manifestly unreasonable. *Id.*

**18.** The doctors incurred actual attorney's fees of $330,899. Providence incurred fees of roughly $326,289. Therefore, the defendants were awarded 45% and 46% of their actual fees, respectively.

**318**

### III.

In summary, we reverse and remand the issue of Providence's alleged negligent spoliation of evidence for a retrial. We also vacate the court's ruling that 7 AAC 12.120 should not set the standard of care regarding written informed consent to Jacob's circumcision, since, in the absence of an evidentiary hearing, there was an inadequate factual basis for this conclusion. We affirm the claims of error regarding the expert witnesses, and vacate the attorney's fees awards.

REVERSED and REMANDED.