**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

|  |  |
|---|---|
| SEATTLE TUNNEL PARTNERS, a Washington joint venture, and HITACHI ZOSEN U.S.A. LTD., | No. 79460-4-I (consolidated with No. 79890-1-I) |
| Petitioners, | |
| WASHINGTON STATE DEPARTMENT OF TRANSPORTATION, | ORDER WITHDRAWING AND SUBSTITUTING OPINION |
| Respondent, | |
| v. | |
| GREAT LAKES REINSURANCE (UK) PLC, a foreign insurance company; SURICH INSURANCE PLC, a foreign insurance company; STARR SURPLUS LINES INSURANCE COMPANY, an Illinois corporation; INDIAN HARBOR INSURANCE COMPANY, a Delaware corporation; ALLIANZ GLOBAL CORPORATE & SPECIALTY AG, a foreign insurance company; TORUS INSURANCE (UK) LIMITED, a foreign insurance company; PARTNER RE IRELAND INSURANCE LIMITED, a foreign insurance company; DOES 1-100, individual and/or corporate members of SYNDICATE 382 AT LLOYD''S, LONDON; and DOES 101-200, individual and/or corporate members of SYNDICATE 1882 AT LLOYD'S LONDON, | |
| Respondents. | |

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The court has determined that the opinion in the above-entitled case filed on March 27, 2023 shall be modified as follows:  The words "acted in bad faith and" are deleted from the second sentence of the first paragraph on page 9 of the opinion.

Now, therefore, it is hereby

ORDERED that the opinion filed on March 27, 2023 is withdrawn and a substitute published opinion reflecting this modification shall be filed.

FOR THE COURT:

_Andrus, J.P.T._

_Chung, J._

_Coburn, J._

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SEATTLE TUNNEL PARTNERS, a Washington joint venture, and HITACHI ZOSEN U.S.A. LTD., | No. 79460-4-I (consolidated with No. 79890-1-I) |
| Petitioners, | DIVISION ONE |
| WASHINGTON STATE DEPARTMENT OF TRANSPORTATION, | PUBLISHED OPINION |
| Respondent, | |
| v. | |
| GREAT LAKES REINSURANCE (UK) PLC, a foreign insurance company; SURICH INSURANCE PLC, a foreign insurance company; STARR SURPLUS LINES INSURANCE COMPANY, an Illinois corporation; INDIAN HARBOR INSURANCE COMPANY, a Delaware corporation; ALLIANZ GLOBAL CORPORATE & SPECIALTY AG, a foreign insurance company; TORUS INSURANCE (UK) LIMITED, a foreign insurance company; PARTNER RE IRELAND INSURANCE LIMITED, a foreign insurance company; DOES 1-100, individual and/or corporate members of SYNDICATE 382 AT LLOYD''S, LONDON; and DOES 101-200, individual and/or corporate members of SYNDICATE 1882 AT LLOYD'S LONDON, | |
| Respondents. | |

No. 79460-4-I/2
(consolidated with No. 79890-1-I)

ANDRUS, J.P.T. — Seattle Tunnel Partners (STP) and Hitachi Zosen U.S.A., Ltd. (Hitachi) appeal an order imposing spoliation sanctions in this insurance coverage lawsuit. STP contends the trial court erred in concluding it committed spoliation and erred in ruling that the Washington Department of Transportation (WSDOT) and STP's builders risk insurance providers (Insurers) were entitled to an adverse inference jury instruction as a sanction. Hitachi argues that even if STP engaged in spoliation, the trial court erred in imposing an adverse inference jury instruction because such a sanction would unfairly prejudice Hitachi, an innocent party.

We reverse. First, we conclude that our spoliation case law requires, as a threshold showing, that the alleged spoliating party owes a duty to the party seeking sanctions to preserve the missing, lost, or destroyed evidence. We conclude that STP owed a contractual duty to WSDOT to preserve evidence relating to its change order request and it foresaw the materiality of this evidence to that claim. But we conclude STP had no duty to the Insurers by contract or otherwise and, as a result, the Insurers are not entitled to a spoliation remedy.

Second, we conclude that an adverse inference jury instruction is only appropriate as a sanction for the intentional destruction of evidence or the willful failure to preserve evidence with an improper motive (i.e., bad faith). The trial court's findings do not support this level of culpability, making an adverse inference instruction inappropriate.

Third, we alternatively conclude that the trial court erred in concluding that the lost evidence was sufficiently important to WSDOT to justify such a harsh

- 2 -

No. 79460-4-I/3
(consolidated with No. 79890-1-I)

sanction in this case. While some sanction may be appropriate, we conclude an adverse inference instruction is not. Because we reverse the spoliation sanction, we need not reach Hitachi's appeal.

<u>FACTS</u>

In 2011, WSDOT contracted with STP to construct an underground tunnel to replace the Alaskan Way Viaduct in Seattle. STP procured a tunnel boring machine (TBM) designed and manufactured by Hitachi. The TBM cutterhead was 57.5 feet in diameter and contained approximately 700 cutting tools. As the TBM advanced, the machine forced excavated material through the TBM to a conveyor belt for disposal.

Pursuant to its design-build contract with WSDOT, STP obtained a builder's all-risk insurance policy from Great Lakes Reinsurance (UK) PLC and several insurance underwriters[1] (collectively Insurers). The policy insured against damage to both the tunneling works and the TBM. WSDOT and STP are both named insureds under the policy. Hitachi claims to be an insured as well, a claim the Insurers dispute.

STP launched the TBM and began mining in July 2013. Between July 2013 and December 2013, the TBM experienced a variety of problems, including clogging and deformation of the cutterhead, which cracked the machine's center pipe. On December 4, 2013, the TBM encountered the steel casing of an

---

[1] Great Lakes Reinsurance is joined by the following insurance underwriters: Zurich American Insurance Company, Starr Surplus Lines Insurance Company, Indian Harbor Insurance Company, Allianz Global Corporate and Specialty SE, Torus Insurance (UK) Limited, PartnerRe Ireland Insurance Limited, Syndicate 382 at Lloyd's of London, and Syndicate 1882 at Lloyd's of London.

No. 79460-4-I/4
(consolidated with No. 79890-1-I)

abandoned test well (TW-2). TW-2 was over 100 feet long, consisting of 93 feet of 8-inch diameter steel pipe with 3/8-inch thick walls, and 15 feet of fine steel mesh.

In the days following the encounter with TW-2, the TBM slowed and began making unusual noises and, by December 7, 2013, stopped mining entirely due to damage to the TBM. On December 12, 2013, STP submitted a notice of a proposed change order to WSDOT, asserting that TW-2 constituted a differing site condition under the contract. Because STP considered TW-2, the alleged differing site condition, to be the cause of the TBM's damage, STP argued that it was entitled to a time extension and an increase in compensation. The TBM did not successfully resume full mining operations until December 2015.

STP recovered a total of nine steel pieces, totaling 89 feet, that it believed came from TW-2. When the TBM first hit TW-2, a portion of the pipe was pushed up through the soil and stood proud above the ground. STP cut off this protruding portion of the pipe. On December 5, STP removed two boulders and two pieces of steel from the TBM's conveyor belt. On December 11, STP pulled a 55-foot long piece of TW-2 out of the ground. On January 2, 2014, STP found a large piece of steel and a collection of small metal fragments in the TBM's "muck bin." On January 18, another two steel pieces were extracted from the TBM's spokes. STP found the final piece on January 25 on the conveyor belt. STP documented and photographed each of these pieces.

STP's Deputy Project Manager, Greg Hauser, directed employees to place several of the recovered pipe pieces and the boulders from the conveyor belt on a

- 4 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 79460-4-I/5
(consolidated with No. 79890-1-I)

wooden pallet in STP's construction yard. Hauser ordered several supervisors and crew members to retain all of the recovered pipe pieces and boulders. STP, however, did not employ any systematic way of informing every person with access to the pallet not to disturb it. Nor did STP put a label or sign on or near the pallet. General Superintendent Tom McMahon testified that he intended to move the pallet's contents to STP's storage warehouse, but never did so.

In February 2014, McMahon gave the order for the yard foreman to "clean the yard up." A couple weeks later, McMahon asked the foreman to move the wooden pallet and its contents to STP's storage warehouse. When the foreman and McMahon were unable to locate the pallet or its contents, they discovered that an equipment operator had placed the steel pieces in the dumpster for steel waste disposal while cleaning out the yard. By the time they discovered this fact, the dumpster had been removed and the steel pieces, along with the two boulders, were gone.

Hauser kept handwritten notes in personal journals detailing the project and its progression. His journal covering December 2013 through February 2014, however, also went missing and could not shed light on the TBM's breakdown, or on the loss of the steel pieces.

WSDOT, STP, and Hitachi tendered insurance claims based on the damage to the TBM, losses from the delay in mining, and the cost of construction of an access shaft built to rescue the TBM. The Insurers denied coverage on the basis that the policy excludes coverage for physical damage to the TBM caused by design defects. Following their investigation, the Insurers rejected STP's

No. 79460-4-I/6
(consolidated with No. 79890-1-I)

contention that the encounter with TW-2 had caused any damaged and instead concluded that the "TBM sustained a machinery breakdown due to the fact that it was improperly designed, under dimensioned, and had an inadequate lubrication system. Overall, the TBM was not fit for the specified purpose."

In June 2015, STP initiated this coverage lawsuit against the Insurers in King County Superior Court (King County Coverage Case). WSDOT was joined as a necessary party defendant, but later realigned as a plaintiff. Hitachi joined the action as an intervenor-plaintiff. All three parties sought a declaratory judgment that the policy covers their losses. STP later amended its complaint, alleging the Insurers breached the implied covenant of good faith and violated unfair claims settlement practices regulations, the Consumer Protection Act,[2] and the Insurance Fair Conduct Act.[3]

STP, WSDOT, and Hitachi each dispute the Insurers' contention that design defects caused the TBM's damage. STP and Hitachi both contend that the encounter with TW-2 damaged the TBM. WSDOT, on the other hand, claims that STP operator error, in addition to design defects, damaged the TBM.

After STP initiated the King County Coverage Case, WSDOT filed a separate action against STP in Thurston County Superior Court, alleging that STP had breached the design-build contract when it failed to meet the substantial completion deadline (Thurston County Contract Case). *See Washington State Dep't of Transp. v. Seattle Tunnel Partners*, No. 54425-3-II, slip op. at 5 (Wash.

---

[2] RCW ch. 19.86.
[3] RCW ch. 48.30.

- 6 -

No. 79460-4-I/7
(consolidated with No. 79890-1-I)

Ct. App. June 14, 2022) (unpublished).[4]  STP in turn filed a counterclaim against WSDOT for breach of contract, claiming it was entitled to damages based on alleged differing site conditions relating to the TBM tunneling.  *Id.*

In the King County Coverage Case, the Insurers filed a motion for spoliation sanctions based on STP's failure to preserve the pieces of TW-2 and requested that the court "instruct the jury to presume that the evidence STP spoliated would be unfavorable to STP" and to preclude STP from arguing that the pipe contributed to the TBM's failure.  WSDOT subsequently filed a similar motion for the loss of the several steel pipe fragments, three boulders, and Hauser's work journal at the time of the pipe strike.  STP moved for an evidentiary hearing to resolve any factual disputes relating to the alleged spoliation,[5] a request the trial court denied.

Around the same time, WSDOT moved for spoliation sanctions in the Thurston County Contract Case, seeking an adverse jury instruction based on STP's failure to preserve pieces of TW-2, the boulders, and Hauser's journal.  The Thurston County Superior Court granted STP's request for an evidentiary hearing.

Hitachi, in response to the spoliation motions in both cases, took no position regarding STP's culpability, but strongly opposed the proposed sanctions of excluding evidence about TW-2 or imposing an adverse inference jury instruction.

---

[4] https://www.courts.wa.gov/opinions/pdf/D2%2054425-3-II%20Unpublished%20Opinion.pdf.
[5] Because WSDOT had filed a similar motion for spoliation sanctions in Thurston County and the trial court in that case had agreed to hold an evidentiary hearing on the matter, STP asked that the court refer the evidentiary hearing to the Special Master that had been appointed to oversee discovery in the two cases.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 79460-4-I/8
(consolidated with No. 79890-1-I)

Hitachi argued that either sanction would unfairly prejudice it as an innocent party because its theory of causation and that of STP were so strongly aligned.

The King County Superior Court granted the Insurers' and WSDOT's motions for spoliation sanctions on December 7, 2018. It found that "[t]he missing pipe fragments and boulders are certainly important and relevant." It also found that the lack of access to these physical objects did not prevent any of the parties' experts from developing opinions and none claimed that the lack of an ability to physically examine the fragments severely impacted their ability to reach their conclusions. With regard to the missing Hauser journals, the trial court could not determine how important that evidence was but found their relevance to be "clear."

As to STP's culpability, the trial court found that STP had a duty to preserve the evidence and that STP's explanation for the lost items, "while perhaps not clearly evidencing intent, can hardly be characterized as innocent given the stakes." Because the "critically relevant" evidence was within STP's exclusive control and was lost or destroyed "without satisfactory explanation," the trial court determined that WSDOT and the Insurers were entitled to an adverse jury instruction. The court rejected the Insurers' and WSDOT's request for the harsher sanction of excluding all evidence relating to the pipe strike.

The trial court ordered WSDOT and the Insurers to each propose an instruction "that establishes an adverse inference relating to the evidence that has been lost or destroyed by STP." Before the court approved any such instruction, both STP and Hitachi moved for, and this court granted, discretionary review.

- 8 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 79460-4-I/9
(consolidated with No. 79890-1-I)

Meanwhile, the Thurston County Superior Court conducted an evidentiary hearing on January 9 and 10, 2019, after which it also granted WSDOT's request for spoliation sanctions in an April 19, 2019 order containing over 190 findings of fact and 29 conclusions of law. Findings of Fact & Conclusion of L. re Evidentiary Hr'g on Spoliation, *Wash. State Dep't of Transp. v. Seattle Tunnel Partners*, No. 16-2-00980-34 (Thurston County Super. Ct., Wash. Apr. 19, 2019) ("Thurston FF&CL"). It concluded STP had acted in conscious disregard of the importance of the pipe pieces and boulders and that this missing evidence was important and relevant. *Id.* at 44. The court approved an instruction directing the jury to infer that the missing steel pieces did not damage the TBM and a second instruction permitting the jury to infer that the lost Hauser journal contained information adverse to STP's position in the case. *Seattle Tunnel Partners*, slip op. at 8. A Thurston County jury subsequently found that the TW-2 steel casing was not a differing site condition as that term was defined in the WSDOT contract and awarded $57.2 million in liquidated damages to WSDOT. *Id.* at 11-12.

We stayed this appeal from June 2019 to January 2020 and again from June 2020 to August 2021, when we granted STP's and Hitachi's motions for discretionary review.

In June 2022, before this court heard oral argument on this appeal, Division Two affirmed the jury verdict against STP in favor of WSDOT in the Thurston County Contract Case and concluded that any error in giving an adverse inference jury instruction in that case was harmless because the instructions concerned causation, an issue the jury never reached. *Id.* at 30.

- 9 -

No. 79460-4-I/10
(consolidated with No. 79890-1-I)

ANALYSIS

STP argues the trial court erred in concluding that it committed spoliation. STP and Hitachi both contend the court erred in concluding that WSDOT and the Insurers are entitled to an adverse inference jury instruction as a sanction for STP's conduct.[6]

Standard of Review

We review a trial court's decision imposing sanctions for spoliation for abuse of discretion. *J.K. by Wolf v. Bellevue Sch. Dist. No. 405*, 20 Wn. App. 2d 291, 303, 500 P.3d 138 (2021). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *Id*. A court's decision is manifestly unreasonable if, given the facts and the applicable legal standard, it is outside the range of acceptable choices. *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). A decision is based on untenable grounds if the record does not support the trial court's factual findings. *Id.* We review the trial court's findings of fact for substantial evidence. *J.K. by Wolf*, 20 Wn. App. 2d at 302. Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person that the premise is true. *Id.* at 303.

We review de novo whether a duty to preserve evidence exists. *Id*. And we review de novo whether a trial court applied the correct legal standard in

---

[6] STP also argues that the trial court erred in denying STP's request for an evidentiary hearing. We conclude that, in light of the evidentiary hearing STP obtained in the Thurston County Contract Case, where it had the opportunity to litigate the factual and legal issues fully, this issue is now moot.

No. 79460-4-I/11
(consolidated with No. 79890-1-I)

assessing sanctions for spoliation. *Id.* A trial court's decision is an abuse of discretion if based on an incorrect legal standard or the facts do not meet the requirements of the correct legal standard. *Littlefield*, 133 Wn.2d at 47.

Summary of Issues

The parties disagree on several key legal principles relating to the doctrine of spoliation. First, STP contends that the existence of a duty to preserve evidence is a threshold legal issue and that, without such a duty, no spoliation can occur. WSDOT and the Insurers argue, on the other hand, that the existence of a duty to preserve evidence is merely one of many factors a trial court should assess in determining a party's culpability for its destruction of or failure to preserve evidence.

Second, STP contends that "spoliation" is a legal term of art, limited to the intentional destruction of evidence. The parties agree that "[w]hen a party intentionally withholds or destroys evidence, the trial court may issue a spoliation instruction for the jury to draw an inference that the missing evidence would be unfavorable to the party at fault." *Henderson v. Thompson*, 200 Wn.2d 417, 441, 518 P.3d 1011 (2022). Both the King County and Thurston County Superior Courts found that STP did not intentionally destroy the TW-2 pieces, the boulders, or Hauser's journal. But WSDOT and the Insurers maintain that under Washington case law, courts have extended the term "spoliation" to conduct that includes the failure to preserve evidence in bad faith and to conduct constituting a conscious disregard for the importance of that evidence.

- 11 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 79460-4-I/12
(consolidated with No. 79890-1-I)

Third, STP argues that even if the unintentional failure to preserve evidence can constitute spoliation and some sanction is appropriate, an adverse jury instruction is so severe a sanction that it should be reserved for intentional misconduct. WSDOT and the Insurers contend that the sanction may be imposed, regardless of the level of culpability of the spoliating party, whenever a trial court deems the missing evidence to be so important and relevant that the only way to level the litigation playing field is to instruct the jury to infer that the missing evidence is unfavorable to the spoliating party.

Finally, STP maintains that the trial court's findings are insufficient to support the conclusion that spoliation occurred or that STP acted with the requisite level of culpability to warrant an adverse jury instruction. WSDOT and the Insurers disagree.

Hitachi, in its separate appeal, contends that even if STP committed spoliation, an adverse inference instruction cannot be imposed when doing so would prejudice its rights as an innocent party advancing the same factual theories as STP.

Because the parties raise questions of first impression and rely on spoliation case law that, on its face, appears to support their respective arguments, we take this opportunity to clarify whether a duty to preserve evidence is a prerequisite to the imposition of any spoliation sanction, what level of culpability is required for the sanction of an adverse inference instruction, and the factors courts should consider in determining whether the missing or lost evidence is sufficiently relevant and important to warrant such a harsh sanction.

No. 79460-4-I/13
(consolidated with No. 79890-1-I)

A. Evolution of Spoliation Doctrine in Washington

The origin of our modern-day spoliation doctrine in Washington appears to be the case of *State v. Constantine*, 48 Wash. 218, 93 P. 317 (1908). In that case, the State charged Constantine with the attempted murder of Hall. *Id.* at 220. Hall claimed at trial that certain individuals had approached him on Constantine's behalf and asked that he drop his civil lawsuit for damages, accept money to travel to California, and not appear in the criminal proceeding. *Id.* at 220-21. The court refused to allow Constantine to call witnesses to dispute Hall's accusations. In reversing the conviction, the court stated:

> It is a rule of evidence, as old as the law itself, applicable alike to both civil and criminal causes, that a party's fraud in the preparation or presentation of his case, such as the suppression or attempt to suppress evidence by the bribery of the witness *or the spoliation of documents*, can be shown against him as a circumstance tending to prove that his cause lacks honesty and truth.

*Id.* at 221 (emphasis added). Bribing witnesses and spoliation of documents, it said, is evidence showing one's consciousness of guilt. *Id.* at 222. Because Hall's testimony was admissible for this reason, Constantine should have been permitted to present evidence that Hall's testimony was untrue.[7] *Id.* at 227.

We next see the evidentiary inference discussed in *Constantine* arise in the case of *British Columbia Breweries (1918) Ltd. v. King County,* 17 Wn.2d 437, 135 P.2d 870 (1943). In that case, a King County brewery challenged the county's

---

[7] In *Wood v. Miller*, 147 Wash. 251, 254-55, 265 P. 727 (1928), the Supreme Court cited to *Constantine* for the proposition that testimony from a witness that she had been approached by a party's attorney with a bribe to absent herself from the trial was admissible. It also approved an adverse inference jury instruction against a party who attempted to bribe the witness. But the court did not discuss such an instruction in the context of the spoliation of documents or other physical evidence.

- 13 -

No. 79460-4-I/14
(consolidated with No. 79890-1-I)

imposition of personal property taxes on buildings it had constructed on county land leased to the brewery. *Id.* at 439-40. On appeal, the brewery challenged the trial court's valuation of the property and argued that the court erred in considering the amount for which it had insured the property because the policy itself may have allocated value between the building and its contents. *Id.* at 453-54.

The Supreme Court rejected that argument based on two evidentiary principles. First,

> [t]he failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, that the party fears to do so, and this fear is some evidence that the circumstance, or document or witness, if brought, would have exposed facts unfavorable to the party.

*Id.* at 454 (quoting 2 WIGMORE ON EVIDENCE (3rd ed.) § 285, at 162). Second, it held that:

> It is a well-established rule that where relevant evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and he fails to do so, without satisfactory explanation, the jury may draw an inference that such evidence would be unfavorable to him. This rule is uniformly applied by the courts and is an integral part of our jurisprudence.

*Id.* at 454-55 (quoting 20 AM. JUR., *Nonproduction, Suppression, Destruction, or Fabrication of Evidence*, § 183 (1939)).[8]

---

[8] The Supreme Court, citing *British Columbia Brewery*, approved this statement of the law in *Krieger v. McLaughlin*, a case in which it reversed an order granting a defendant a new trial after the plaintiff commented in closing that the defendant's failure to introduce any evidence at trial allowed the jury to infer that the reason for doing so was that the evidence would have been unfavorable. 50 Wn.2d 461, 464 n.7, 313 P.2d 361 (1957).

- 14 -

No. 79460-4-I/15
(consolidated with No. 79890-1-I)

In 1977, the Supreme Court relied on *British Columbia Brewery* to affirm a trial court finding of taxpayer discrimination in *Pier 67, Inc. v. King County,* 89 Wn.2d 379, 385-86, 573 P.2d 2 (1977). In that case, a taxpayer challenged the validity of the county valuations placed on its leasehold interests and improvements on state-owned land. *Id*. at 380. In discovery, during the pendency of litigation, Pier 67 sought the production of tax assessment documents relating to two similarly situated taxpayers, documents the county claimed were unavailable. *Id*. at 385-86. The Supreme Court, citing *British Columbia Brewery*, noted that the county had been on notice for years that Pier 67 sought evidence on how the county had assessed two other taxpayers to prove discriminatory treatment. *Id.* at 385. Because the county, who was in control of its own documents, lacked a satisfactory explanation for the loss of these documents, the court concluded that "the only inference which may be drawn is unfavorable to the contention of the [County] that such discriminatory techniques were not in fact employed." *Id.* at 386.

These cases treated the loss of evidence as a simple evidentiary issue, allowing a party to argue at trial that missing, lost, or destroyed evidence was substantive proof that the missing evidence was unfavorable to the party who controlled it.[9]

---

[9] *See also State v. Mark*, 36 Wn. App. 428, 434, 675 P.2d 1250 (1984) (in determining restitution for a defendant's prescription fraud, auditors and trial court were permitted to infer that fraudulent prescriptions that existed before the audit but were missing thereafter were destroyed by the defendant to prevent their discovery); *Giles v. Washington Horse Racing Comm'n*, 53 Wn. App. 932, 934-35, 771 P.2d 1159 (1989) (loss of optional blood sample, destroyed in accordance with routine laboratory procedures, did not warrant inference that evidence was unfavorable to commission); *Lynott v. National Union Fire Ins. Co. of Pittsburgh, PA*, 123 Wn.2d 678, 689, 871

- 15 -

No. 79460-4-I/16
(consolidated with No. 79890-1-I)

The first case to lay out a test for imposing a sanction for spoliation was *Henderson v. Tyrrell*, 80 Wn. App. 592, 910 P.2d 522 (1996). In that case, three Henderson siblings were riding in Tyrrell's Camaro when the car crashed. *Id*. at 596. Tyrrell was thrown from the car and seriously injured. Tyrrell claimed Darrell Henderson was driving at the time of the accident; the Henderson siblings said Tyrrell was at the wheel. *Id*. at 597-98. The jury determined Henderson caused the accident and awarded Tyrrell over $3.5 million in damages. *Id*. at 602.

The Hendersons claimed they were denied a fair trial because Tyrrell had destroyed his wrecked Camaro, had not produced blood samples his mother had collected from the interior of his car shortly after the accident, and the police lost the shoes Tyrrell was wearing on the night of the accident. *Id*. at 603. The trial court denied the Hendersons' request to dismiss Tyrrell's claim, to limit the evidence he could present, or to instruct the jury on the issue of spoliation of evidence because it found no "pattern of willful destruction, and the car was available for inspection by both sides after the accident." *Id*. at 604.

On appeal, this court recognized as "long-standing," the problem that litigants and courts faced with the destruction or loss of potentially relevant evidence. *Id*. at 604. It noted that spoliation, defined in Black's Law Dictionary as "[t]he intentional destruction of evidence," had "historically [] been treated as an evidentiary matter," with the remedy being an inference that the party's conduct in destroying the evidence tended to corroborate the opposing party's case. *Id*. at

P.2d 146 (1994) (National Union could not find its underwriting file; court affirmed evidentiary inference that file materials would be unfavorable to it).

- 16 -

No. 79460-4-I/17
(consolidated with No. 79890-1-I)

605. This approach was in fact that taken by our Supreme Court in *British Columbia Brewery* and *Pier 67*.

The *Henderson* court identified two different approaches courts had begun to take to sanction spoliation. Citing *Sweet v. Sisters of Providence*, 895 P.2d 484, 490-91 (Alaska 1995), it recognized that some state courts were applying "a rebuttable presumption, shifting the burden of proof to a party who destroys, alters, or loses important evidence." *Henderson*, 80 Wn. App. at 605. It noted that federal courts had taken a different path, treating spoliation as a civil discovery violation, the remedy for which is sanction under Fed. R. Civ. Pro. 37. *Id.* at 605-06 (citing *Shepherd v. American Broadcasting Cos.,* 62 F.3d 1469, 1474-75 (D.C. Cir. 1995); *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 266-67 (8th Cir. 1993)).

The *Henderson* court said that, regardless which approach it took, sanctioning Tyrrell for the loss of the blood samples and missing shoes was inappropriate because he was not responsible for the evidence, or even know that it was missing. *Id*. at 606. As for the disposal of the car, the court referred back to *Pier 67* as one of "the few Washington cases that address the problem." *Id.* It recognized that the Supreme Court applied an adverse inference in that case because the county lacked a satisfactory explanation for the loss of its tax documents, but found no clarity as to what explanation could be offered to avoid a *Pier 67* adverse inference. *Id.* at 606-07. The court chose to adopt the Alaska Supreme Court's approach in *Sweet*:

> In deciding whether to apply a rebuttable presumption in spoliation cases, the Alaska Supreme Court examined two general factors: (1)

- 17 -

No. 79460-4-I/18
(consolidated with No. 79890-1-I)

> the potential importance or relevance of the missing evidence; and
> (2) the culpability or fault of the adverse party.

*Id.* (citing *Sweet*, 895 P.2d at 491).  As to the first factor, the *Henderson* court said "whether missing evidence is important or relevant obviously depends on the particular circumstances of the case."  *Id.*  Other "important considerations" were whether the loss or destruction of the evidence resulted in an investigative advantage for one party over another, or whether the adverse party was afforded an adequate opportunity to examine the evidence.  *Id.*

The parties in *Henderson* presented expert testimony that having the actual vehicle available to inspect would have provided a better understanding of how Tyrrell's injuries occurred, but the court concluded there were extensive photographs of the car admitted into evidence and both parties had had two years to inspect the car before Tyrrell disposed of it.  These facts, the court held, supported the trial court's decision not to impose any sanctions against Tyrrell at trial.  *Id.* at 608-09.

As to the culpability factor, the court stated that "many courts examine whether the party acted in bad faith or conscious disregard of the importance of the evidence, or whether there was some innocent explanation for the destruction."  *Id.* at 609.  The reason for looking at this factor "derives from the evidentiary inference that spoliation creates; unless there was bad faith, there is no basis for 'the inference of consciousness of a weak cause.'"  *Id.* (quoting 2 MCCORMICK ON EVIDENCE § 265, at 191 (John William Strong ed., 4th ed. 1992)).  Because the Hendersons lacked any evidence that Tyrrell acted in bad faith in destroying his

- 18 -

No. 79460-4-I/19
(consolidated with No. 79890-1-I)

car, the court concluded this evidence supported the denial of spoliation sanctions. *Id.* at 609-11.

*Henderson* went on: "[a]nother important consideration is whether the actor violated a duty to preserve the evidence." *Id.* at 610. The court cited *Simich v. Culjak*, 27 Wn.2d 403, 178 P.2d 336 (1947),[10] a case in which a defendant violated a duty he owed as a managing partner to render accurate accounts of the partnership business to his partners, and *Carr v. St. Paul Fire & Marine Ins. Co.*, 384 F. Supp. 821 (W.D. Ark. 1974),[11] and *DeLaughter v. Lawrence County Hosp.*, 601 So.2d 818 (Miss. 1992),[12] cases in which the destruction of medical records violated legal or regulatory requirements. *Henderson*, at 610. It concluded that Tyrrell had no similar duty to retain the Camaro. *Id*. Although Tyrrell's attorney had received a request from the Hendersons' attorney to retain the vehicle and Tyrrell could be charged with knowledge through his attorney, the court concluded that the Hendersons failed to establish that a breach of any duty to retain the car prejudiced their case because they "had ample opportunity during [the two years

---

[10] In *Simich*, a partnership dissolution case, the court held that the managing partner who failed to maintain records of his transactions on behalf of the partnership breached his duty of good faith toward the other partners and was thus not entitled to take part in the division of the remaining partnership assets. 27 Wn.2d at 410.

[11] In *Carr*, a medical malpractice action based on a hospital's refusal to treat the decedent in a medical emergency, hospital employees destroyed medical records of the patient's vital signs after learning that he had died. 384 F. Supp. at 831. The court held that the jury had the right to infer from the destruction of this evidence that it would have proved the existence of a medical emergency. *Id.*

[12] *DeLaughter* is a medical malpractice action against an emergency room physician and hospital for failure to diagnose a fatal condition and a separate claim for negligence in the destruction of the patient's hospital records, in violation of Mississippi statute. 601 So.2d at 821. It held that "where the evidence is positive that the hospital deliberately destroyed the original medical record or where a record required by law ito be kept is unavailable due to negligence, an inference arises that the record contained information unfavorable to the hospital, and the jury should be so instructed." *Id.* at 821-22.

- 19 -

No. 79460-4-I/20
(consolidated with No. 79890-1-I)

prior to litigation] to examine the car" and Tyrrell had not prevented them from doing so. *Id.* at 611.

The *Henderson* court separately analyzed the trial court's refusal to give an adverse inference jury instruction. *Id.* at 612-13. Citing to the Washington Pattern Jury Instructions WPI 5.01, entitled "Failure to Testify or Produce Evidence," it noted that the Pattern Jury Instruction Committee recommended that trial courts *not* instruct a jury on a party's failure to produce evidence or a witness. *Id.* at 612. It rejected the Hendersons' argument that the WPI committee's comment related only to the failure to call witnesses, concluding that even if the failure to produce physical evidence is different from the failure to produce witnesses, the trial court reasonably concluded Tyrrell had satisfactorily explained his destruction of the Camaro. *Id.* at 613.

Division Two of this court applied the *Henderson* framework in *Marshall v. Bally's Pacwest, Inc.*, 94 Wn. App. 372, 972 P.2d 475 (1999). In that case, a health club member injured on a treadmill machine sued the club, the treadmill manufacturer, and the repairer for damages. *Id*. at 376. On appeal of a summary judgment order dismissing the action, Marshall contended the trial court should have applied a favorable evidentiary presumption in her favor because the treadmill was destroyed before she could inspect it. *Id*. at 381. The *Marshall* court, like *Henderson*, recognized that the term "spoliation" means the "intentional destruction of evidence." *Id*. Citing to *Pier 67* and *Henderson*, the court said that spoliation may be remedied with a rebuttable presumption shifting the burden of proof to a party who destroys or alters important evidence. *Id*. The court

- 20 -

No. 79460-4-I/21
(consolidated with No. 79890-1-I)

concluded that Marshall was not entitled to this adverse inference, however, because she had four years in which to ask the club to preserve the machine or to inspect it, and the treadmill was not destroyed in bad faith.[13] *Id.* at 382-83.

Division Two again revisited *Henderson* in *Homeworks Constr., Inc. v. Wells*, 133 Wn. App. 892, 138 P.3d 654 (2006). In that case, a general contractor settled a claim from homeowners for the alleged improper installation of synthetic stucco on their house and then sued the two stucco subcontractors for breach of contract and indemnification. *Id.* at 896. The trial court granted summary judgment to the subcontractors as a sanction for spoliation of evidence because the homeowners—who were not parties to the litigation—repaired the house before the subcontractors could inspect the damage. *Id.* at 897.

On appeal, the subcontractors argued that the general contractor and its insurer had a duty to preserve the evidence for the subcontractors to inspect. *Id.* at 901. This court rejected that argument and reversed because neither the general contractor nor its insurer, State Farm, had a duty to notify the subcontractors that the homeowners might repair the house and they did not control the house or have access to the premises being repaired. *Id.*

Focusing on the culpability element of the *Henderson* test, the court noted that spoliation is a "term of art, referring to the legal conclusion that a party's

---

[13] At least one commentator cites *Marshall* for the proposition that "the destruction of potential evidence is not always improper, and thus when a party is alleged to have committed spoliation, the threshold issue is whether the party had any duty to preserve the evidence in the first place. If no such duty existed, a finding of spoliation is unwarranted." 15A DOUGLAS J. ENDE, WASHINGTON PRACTICE: HANDBOOK ON CIVIL PROCEDURE § 56.15, at 556 (2021).

- 21 -

No. 79460-4-I/22
(consolidated with No. 79890-1-I)

destruction of evidence was both willful *and* improper." *Id*. at 900 (quoting KARL B. TEGLAND, 5 WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 402.6, at 37 (2005)). It recognized that, in *Henderson*, the court said that spoliation may occur when a party acts in bad faith or with "conscious disregard" for the importance of the evidence, suggesting that "spoliation encompasses a broad range of acts beyond those that are purely intentional or done in bad faith." *Id*. (citing *Henderson*, 80 Wn. App. at 605). But, the *Homeworks* court said, even if a party may be responsible for spoliation without a finding of bad faith, "the party must also have a duty to preserve the evidence." *Id*. "A party's actions are 'improper' and constitute spoliation where the party has a duty to preserve the evidence in the first place." *Id.*

The court concluded that there was no evidence that the general contractor or insurer acted intentionally or in bad faith. "At most, Homeworks/State Farm failed to take steps to preserve potential evidence." *Id*. at 901. It rejected the subcontractors' argument that, under *Henderson*, a party who knows it intends to sue and is aware of the evidence's importance has a general duty to preserve that evidence. *Id*. It then stated "[w]hile [the subcontractors] may be correct that a party has a general duty to preserve evidence on the eve of litigation, we do not agree that this duty extends to evidence over which a party has no control." *Id*. It reasoned that there was no contractual obligation for the contractor to notify the subcontractors of any potential claims from the homeowners. *Id*. And, it said, there was no indemnification provision requiring the subcontractors to defend the general contractor from the homeowners' claim. *Id*. Finally, it stated there was no

- 22 -

No. 79460-4-I/23
(consolidated with No. 79890-1-I)

legal method to force the homeowners to permit the subcontractors to inspect the house. *Id*. at 901-02. It concluded

> Without evidence in the record that the [homeowners] notified Homeworks/State Farm that they were going to repair their house within two months of settlement, and absent evidence that Homeworks/State Farm's failure to notify [the subcontractors] was in bad faith, Homeworks/State Farm did not breach a duty to preserve the [stucco] on the [homeowners'] house.

*Id.* at 902. The court reversed the spoliation sanction.

After *Homeworks*, we concluded that a duty to preserve evidence does not arise simply because a person has been injured by an arguably negligent act and a lawsuit is a possibility. *Ripley v. Lanzer*, 152 Wn. App. 296, 326, 215 P.3d 1020 (2009); *Tavai v. Walmart Stores, Inc.*, 176 Wn. App. 122, 136, 307 P.3d 811 (2013). Division Three formally adopted this holding in *Cook v. Tarbert Logging, Inc.*, 190 Wn. App. 448, 360 P.3d 855 (2015). *Cook* involved a driver injured in an accident with a logging truck. *Id*. at 450-51. After a defense jury verdict, Cook appealed, arguing that the trial court erred in excluding testimony of his expert based on findings of spoliation. *Id*. at 460. At trial, the logging company claimed Cook had committed spoliation by allowing his nephew to part out his damaged truck without taking steps to download the electronic airbag control monitoring data from the truck, data that would have tracked Cook's speed while driving on the day of the accident. *Id*. at 454-58.

The trial court found that Cook's actions in not preserving the data were neither intentional nor made in bad faith, but it nevertheless found Cook culpable because "common sense should have caused the parties on the plaintiff side to

- 23 -

No. 79460-4-I/24
(consolidated with No. 79890-1-I)

say, this item needs to be preserved and there needs to be some notice to the other side." *Id*. at 456. The court precluded Cook's expert from testifying about the speed at which Cook was traveling at the time of the accident. *Id*. The court refused to instruct the jury on spoliation, but allowed the defense to elicit evidence about the existence of the data, the authorization by the plaintiff's agents to dispose of it, and the lack of opportunity for the defense to inspect it. *Id.* at 458.

This court reversed. First, it held that there is no general duty to preserve evidence in anticipation of litigation. *Id*. at 464. Referring to *Henderson*, it noted that, while a letter from an attorney demanding that a person preserve evidence may trigger such a duty, no such letter existed in the *Cook* case. *Id.* Second, it concluded that the mere negligent destruction of evidence cannot support an adverse inference. *Id*. at 469-70. The defendants argued that under federal case law, spoliation sanctions were appropriate for even the negligent loss of evidence. *Id*. at 468-69. The court refused to follow this federal case law, relying instead on language from *Henderson* for the proposition that unless there is bad faith, there is no basis for inferring that the party that lost evidence was conscious of the weakness of their case. *Id*. at 470. It concluded

> In summary, *Henderson* did not recognize a general duty to preserve evidence. We need not consider whether federal authority offered by [the defendants] is persuasive support for finding a general duty to preserve evidence because the federal cases, like *Henderson*, would not support the suggestion of an adverse inference absent bad faith or, at a minimum, gross negligence. In light of the Cooks' merely negligent actions, it is clear that the trial court abused its discretion in permitting evidence and argument suggesting the inference.

*Id*.

- 24 -

No. 79460-4-I/25
(consolidated with No. 79890-1-I)

More recently, in *J.K. by Wolf*, 20 Wn. App. 2d 291, this court affirmed a trial court's decision to enter a default judgment on liability against a school district for the combination of spoliation of video evidence and a series of discovery violations. In its discussion regarding spoliation, the court distilled several key holdings from the reported cases. First, citing *Homeworks*, it held that a party accused of spoliation must have a duty to preserve the missing evidence. *Id*. at 308. Because there is no general duty to preserve evidence under *Cook*, it held that there must be a duty arising from some other source. *Id.* (citing *Henderson*'s examination of cases relating to the duty of a partner to preserve records or the duty of a medical provider to save medical information). In *J.K. by Wolf*, the duty to preserve video evidence of alleged child abuse arose under RCW 40.14.070, a statute requiring the preservation of public records if subject to ongoing or reasonably anticipated litigation, and the school district's records retention policies promulgated pursuant to that statute. *Id*. at 297, 309-10.

Second, relying on *Homeworks*, it reasoned that, while every reported case has defined spoliation as the "intentional destruction of evidence," our courts have nevertheless indicated that spoliation may extend to the failure to preserve evidence when this omission rises to the level of bad faith. *Id*. at 304, 308. The court concluded that the district had acted in bad faith sufficient to justify spoliation sanctions because it had a duty to preserve camera footage, it knew it had this duty, it knew the video footage was important evidence, it knew their camera system would overwrite footage if not stopped, and it took no action to preserve the evidence for six months, leading to the loss of the evidence. *Id.* at 310, 313.

- 25 -

No. 79460-4-I/26
(consolidated with No. 79890-1-I)

B. Duty to Preserve Evidence

The Insurers argue that the existence of a duty to preserve evidence before a lawsuit has been filed is not a threshold legal issue and is merely a factor in the court's determination of a party's level of culpability in failing to preserve evidence. Wash. Court of Appeals oral argument, *Seattle Tunnel Partners, et al. v. Great Lakes Reinsurance (UK) PLC, et. al.,* No. 83343-0-I (Jan. 10, 2023) at 33 min., 20 sec. to 34 min.[14] We disagree.

First, despite the language in *Henderson* that a duty to preserve is an "important consideration," 80 Wn. App. at 610, subsequent cases clearly indicate that the party accused of spoliating evidence must have a duty to preserve that evidence. This rule is clearly laid out in *Homeworks*, *Cook*, and *J.K. by Wolf.* In *Homeworks*, the court held the contractor could not be liable for spoliation because it owed no duty to the subcontractors to either preserve the stucco or to notify the subcontractors of the homeowners' claim for defective workmanship. 133 Wn. App. at 901-02. In *Cook*, the court held the injured driver could not be held liable for spoliation because he owed no duty to the logging truck company to preserve the electronic data stored in his truck. 190 Wn. App. at 470. In *J.K. by Wolf*, the court held that the school district could be held liable for spoliation because it had a duty to preserve the evidence at issue, knew it had this duty, and took no steps to preserve it when it knew the evidence would be overwritten by its video system. 20 Wn. App. 2d at 313.

---

[14] https://tvw.org/video/division-1-court-of-appeals-2023011176/?eventID=2023011176.

- 26 -

No. 79460-4-I/27
(consolidated with No. 79890-1-I)

Second, if the existence of a duty to preserve evidence were not a threshold element of the test, and merely a "factor to consider," it would undercut the settled rule that there is no general duty to preserve evidence before a lawsuit has been filed. That rule of law was the explicit holding in *Cook*, a case recently cited with approval by the Supreme Court in *Henderson v. Thompson*, 200 Wn.2d at 441-42.

Third, the existence of a duty inheres in the concept of culpability. "Culpable" in the civil context means "involving the breach of a duty." BLACK'S LAW DICTIONARY 477 (11th ed. 2019). Each level of culpability recognized in our spoliation case law—from intentional or willful misconduct, to bad faith, conscious disregard, and negligence—contemplates the violation of some duty to preserve that evidence.

"Willful misconduct," for example, is "the intentional doing of an act which one has a duty to refrain from doing or the intentional failure to do an act which one has the duty to do." 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 14.01, at 179 (7th ed. 2019). Bad faith, in the spoliation context, exists when there is destruction of evidence "that is both willful and with an improper motive." *Carroll v. Akebono Brake Corp.*, 22 Wn. App. 2d 845, 875, 514 P.3d 720 (2022) (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 402.5, at 280 (6th ed. 2016)). But to act in "bad faith" in other contexts under Washington law requires the existence of a duty to act in good faith. *See Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 484, 78 P.3d 1274 (2003) (insurer has a duty of good faith to its policyholder and violation of that duty may give rise to a tort for bad faith); *Lodis v. Corbis Holdings, Inc.*, 172 Wn. App.

No. 79460-4-I/28
(consolidated with No. 79890-1-I)

835, 860, 292 P.3d 779 (2013) (corporate officers owe fiduciary duties of good faith and loyalty to the corporations under RCW 23B.08.420); *Bovy v. Graham, Cohen, & Wampold*, 17 Wn. App. 567, 570, 564 P.2d 1175 (1977) (relationship between partners is fiduciary in character and imposes on partners the duty to act in good faith in dealing with each other); *Estate of Carter v. Carden*, 11 Wn. App. 2d 573, 583, 455 P.3d 197 (2019) (there is in every contract an implied duty of good faith and fair dealing; the duty obligates parties to the contract to cooperate with each other so that each may obtain the full benefit of performance).

To act with "conscious disregard" means to act with deliberate indifference. BLACK'S LAW DICTIONARY 923 (11th ed. 2019). In *Henderson*, the court relied on *Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469 (D.C. Cir. 1995), for this concept of culpability in the context of spoliation. 80 Wn. App. at 609. That federal court stated "[a] sanction for failure to preserve evidence is appropriate only when a party has consciously disregarded *its obligation to do so*." *Shepherd,* 62 F.3d at 1481 (emphasis added). There is thus a link between the existence of a duty and one's level of culpability in relation to that duty. One must have a duty to preserve important evidence before one can deliberately disregard that duty.[15]

---

[15] This culpability concept often arises in vehicular assault cases in which driving a vehicle "with disregard for the safety of others" and causing substantial bodily harm is a felony. RCW 46.61.522(1)(c). Our Supreme Court has defined driving with disregard for the safety of others as "an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than the hundreds of minor oversights and inadvertences encompassed within the term 'negligence.'" *State v. Eike*, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967). Negligence is the violation of a duty to exercise ordinary care. *Mathis v. Ammons*, 84 Wn. App. 411, 415-16, 928 P.2d 431 (1996). It thus follows logically that to act with "conscious disregard" means to violate a duty owed to the other party and to do so in a careless manner.

- 28 -

No. 79460-4-I/29
(consolidated with No. 79890-1-I)

Each of these levels of culpability reflects the existence of an underlying duty. We therefore conclude that a court may impose a sanction for the failure to preserve evidence before a lawsuit is initiated only if, as a threshold legal issue, the allegedly spoliating party owed a duty to preserve that evidence. This duty may arise under statute or regulation for the protection of a particular class of individuals. *See J.K. by Wolf*, 20 Wn. App. 2d at 309. It may arise by virtue of a special or fiduciary relationship between the parties. *See Henderson*, 80 Wn. App. at 610. It may arise out of the parties' contracts. *Homeworks,* 133 Wn. App. at 901. Or it may, under some circumstances, arise out of a pre-lawsuit letter from an injured party or their attorney requesting that the party in control of the evidence not dispose of it without prior notice. *Cook*, 190 Wn. App. at 464. But the party seeking a spoliation sanction must establish the existence of a duty to preserve evidence and that this duty is owed to the party seeking sanctions.

We find compelling the test laid out in *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267 (Ill. 1995) and *Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22 (Ill. 2012). In these cases, the Illinois Supreme Court set out a two-prong test to determine if a duty to preserve evidence exists. Under the first, or relationship, prong of the test, a party seeking spoliation sanctions must show that an agreement, contract, statute, special circumstance, or voluntary undertaking has given rise to a duty to preserve evidence on the part of the opposing party. *Id*. at 270-71. Under the second, or foreseeability, prong of the test, the party seeking sanctions must show that the duty extends to the specific evidence at issue by demonstrating that a reasonable person in the opposing party's position should have foreseen that the

- 29 -

No. 79460-4-I/30
(consolidated with No. 79890-1-I)

evidence was material to a potential civil action. *Id*. at 271. If the moving party fails to satisfy both prongs of this test, the opposing party has no duty to preserve the evidence at issue. *Martin,* 979 N.E.2d at 28.

STP argues it owed no duty to either WSDOT or the Insurers to preserve the missing evidence. We disagree as to WSDOT but agree as to the Insurers.

1.    Duty to WSDOT

First, STP owed a contractual duty to WSDOT to preserve evidence relating to any change order requests it made to the agency. Section 11.5.4. of STP's design-build contract with WSDOT provided:

> [STP] agrees that it shall give WSDOT access to all of [STP]'s books, records and other materials relating to the Work in question, and shall cause its Subcontractors to do the same, so that WSDOT can investigate the basis for such proposed Change Order.

The Thurston County Superior Court concluded that the word "materials" as used in this agreement included any pieces of TW-2 that were recovered from the TBM, as well as the boulders and any other materials relating to the change order request STP submitted to WSDOT. Thurston FF&CL at 18.[16] We agree with this interpretation. STP sought additional compensation and more time to complete the project based on the contention that the presence of TW-2 and the boulders were differing site conditions under the contract. These items directly related to that claim and STP agreed to give WSDOT access to these items for investigative purposes.

---

[16] We take judicial notice of these factual findings. Under ER 201(c), courts may take judicial notice of adjudicative facts from another proceeding not for their truth, but to determine what transpired.

- 30 -

No. 79460-4-I/31
(consolidated with No. 79890-1-I)

STP argues that this provision dictates only that it must give access to the evidence, not that it would preserve it. This argument is unpersuasive. In order for WSDOT to access the materials, STP had to preserve them, at least until any proposed change order was resolved. Thus, the contractual duty to preserve the pipe fragments, boulders, and Hauser's work journal[17] arose by December 12, 2013, when STP notified WSDOT of its differing site condition claim related to the TBM's encounter with the pipe. Because that proposed change order was not resolved prior to litigation, STP had an ongoing duty to preserve the evidence to allow WSDOT access to it.

Second, WSDOT established that the duty extended to the specific evidence at issue here by demonstrating that STP should have foreseen, and did foresee, that the evidence was material to a potential civil action against WSDOT. WSDOT presented evidence that STP promised to preserve this evidence and assured it that the missing pipe pieces would not be destroyed. The progress meeting minutes for February 27, 2014, indicate that STP agreed to "preserve all samples for examination." In the following months, STP neither withdrew that assurance nor informed WSDOT that it had discarded this evidence. The progress meeting minutes through April 2014 demonstrate that STP concealed the fact that it had lost the evidence and continued to tell WSDOT that it would analyze the

---

[17] STP argues that this contract provision is inapplicable to Hauser's work journals. But Hauser testified that his journals were used to document his activities on the job site, including conversations he had with other STP employees regarding the operation of the TBM. Presumably, then, Hauser kept notes regarding the TBM's encounter with TW-2 and its subsequent breakdown. Under the plain language of the contract, Hauser's journals constitute records or other materials relating to the work in question, which WSDOT could use in investigating the proposed change order. STP had a duty to preserve that evidence.

No. 79460-4-I/32
(consolidated with No. 79890-1-I)

metal fragments despite knowing they were missing. STP did not inform WSDOT

that the steel fragments and boulders were gone until February 20, 2015. The trial

court did not err in finding that STP recognized that it owed a contractual obligation

to WSDOT to preserve this evidence, and it is clear from this record that STP

foresaw its materiality to any claim against WSDOT.

2.      Duty to Insurers

We reach a different conclusion with regard to the Insurers' claim that STP

owed them a similar evidence preservation duty.

The Insurers do not contend that the insurance policies between STP and

the Insurers contain a provision imposing a duty of evidence preservation. The

Insurers argue instead that they have the right to rely on STP's contractual duty to

WSDOT by virtue of the design-build contract. But the language of that agreement

is not so broad. It merely requires STP to preserve materials for WSDOT to

evaluate change order requests. It says nothing about preserving evidence for

potential insurance claims.

Moreover, the design-build contract between WSDOT and STP limits third-

party beneficiaries in Section 26.9, which states in relevant part:

> *It is not intended by any of the provisions of the Contract Documents to create any third party beneficiary hereunder*, other than the City, or to authorize anyone not a party hereto to maintain a suit for personal injury or property damage pursuant to the terms or provisions hereof, except to the extent that specific provisions (such as the warranty and indemnity provisions) identify third parties (such as Utility Owners) and state that they are entitled to benefits hereunder. Except as otherwise provided in this <u>Section 26.9</u>, *the duties, obligations and responsibilities of the Parties to the Contract Documents with respect to third parties shall remain as imposed by law*.

- 32 -

No. 79460-4-I/33
(consolidated with No. 79890-1-I)

(Emphasis added). The Insurers provide no analysis as to why they are entitled to benefit from a contractual duty that STP owes to WSDOT when that same contract negates third party beneficiary rights. The design-build contract does not create a contractual duty as to the Insurers.

At oral argument, the Insurers argued that STP had an implicit duty to cooperate with the Insurers' investigation of the insurance claim. Wash. Court of Appeals oral argument, *Seattle Tunnel Partners, et al. v. Great Lakes Reinsurance (UK) PLC, et. al.,* No. 83343-0-I (Jan. 10, 2023) at 35 min., 5 sec. to 35 min., 20 sec. While many insurance policies contain clauses requiring insureds to cooperate with an insurer's handling of a claim, *Staples v. Allstate Ins. Co.*, 176 Wn.2d 404, 410, 295 P.3d 201 (2013), the policies at issue here contain no such cooperation provision. And the Insurers have cited no authority for the proposition that an insured has an implied duty to preserve evidence in the absence of a contract provision addressing the issue.[18] While insurers owe a fiduciary duty to their policyholders, that duty exists "because of the contract between the insurer and the insured, the high stakes for both parties, and the 'elevated level of trust underlying insureds' dependency on their insurers.'" *Dussault ex rel. Walker-Van Buren v. American Int'l Grp., Inc.*, 123 Wn. App. 863, 868, 99 P.3d 1256 (2004) (quoting *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 385, 715 P.2d 1133 (1986)). No court has held that the insureds owe fiduciary duties to their insurers.

---

[18] Nor have the Insurers contended that STP's failure to preserve evidence constitutes a breach of any duty of good faith and fair dealing implicit in their insurance contracts.

No. 79460-4-I/34
(consolidated with No. 79890-1-I)

The Insurers ask us to follow federal law and hold that STP had a general duty to preserve the evidence in anticipation of the coming litigation. But our courts have repeatedly refused to impose a general duty of evidence preservation merely because litigation is foreseeable in the absence of a demand for the retention of, or access to, the evidence, merely because litigation is foreseeable. *See Tavai*, 176 Wn. App. at 136 (where the plaintiff sought an adverse inference instruction against a retailer that destroyed surveillance video, the court "decline[d] to require store premises to retain all video anytime someone slips and falls and files an accident report"); *Ripley,* 152 Wn. App. at 326 (court rejected argument that hospital staff intentionally discarded broken scalpel handle in bad faith in part because, at the time it was discarded, the lawsuit had not commenced and no request had been made to retain the handle).

In *Homeworks,* the court suggested, without deciding, that a party *may* have a duty to preserve evidence "on the eve of litigation." 133 Wn. App. at 901. In *Cook*, the court rejected any suggestion that such a general duty to preserve exists unless a party receives a request to preserve evidence in anticipation of impending litigation. 190 Wn. App. at 464. In *Carroll*, we cited *Cook* for the proposition that "courts should consider whether a request to preserve the evidence [was] made before the evidence was destroyed." 22 Wn. App. 2d at 875.

There is no evidence here that the Insurers sent STP any formal or informal request to preserve any evidence before that evidence disappeared. There is also no support in the record to suggest that STP lost the evidence on "the eve of litigation." The events leading to the disposal of the pipe pieces and boulders

- 34 -

No. 79460-4-I/35
(consolidated with No. 79890-1-I)

occurred more than a year before the Insurers denied STP's claim for insurance coverage or STP filed its insurance coverage lawsuit.

Under the two-prong test we adopt here, even if STP should have reasonably foreseen that the pipe pieces, boulders, and project manager notebooks were material to their anticipated insurance coverage claim against the Insurers, there is no evidence of an agreement, statute, special circumstance, or voluntary undertaking between these parties that would give rise to a duty to preserve evidence on STP's part. Because STP did not owe an evidence preservation duty to the Insurers, they are not entitled to spoliation sanctions against STP. The trial court erred in concluding otherwise.

C. Levels of Culpability[19]

Because STP owed a contractual duty to WSDOT to preserve the evidence and it breached that duty, we next address what level of culpability is sufficient to justify an adverse inference instruction. STP contends its breach may warrant some sanction, but if the breach was neither intentional nor made in bad faith, it does not justify an adverse inference instruction. We agree.

If a party had a duty to preserve evidence and breaches that duty, a court must then determine whether the spoliating party acted intentionally, in bad faith, with conscious disregard for the importance of the evidence, negligently, or innocently. *Henderson,* 80 Wn. App. at 609; *Homeworks*, 133 Wn. App. at 900.

---

[19] STP argues that WSDOT cannot request spoliation sanctions against STP because WSDOT and STP are not adverse parties in this litigation and the design-build contract prohibits WSDOT from doing so. Because we reverse the spoliation sanction order for other reasons, we do not reach these issues.

No. 79460-4-I/36
(consolidated with No. 79890-1-I)

On the one end of the culpability spectrum, we have held that no sanction may be imposed if a party has acted merely negligently in failing to preserve evidence, or has an innocent explanation for the evidence's loss or destruction. *Cook*, 190 Wn. App. at 462, 464; *Carroll*, 22 Wn. App. 2d at 875-76. And on the other end of the spectrum, we have also clearly held that an adverse inference jury instruction is appropriate if a party intentionally destroyed the evidence to gain a litigation advantage, or willfully failed to preserve the evidence with an improper motive (i.e., bad faith). *Henderson*, 80 Wn. App. at 606; *J.K. by Wolf*, 20 Wn. App. 2d at 313-14.

What is less clear, however, is whether this particular sanction is appropriate for conduct that is nether innocent nor negligent, but also neither intentional nor done with an improper motive. This is the grey zone into which STP's conduct arguably falls. If we assume STP consciously disregarded the importance of the evidence to WSDOT, does it logically follow that STP must have believed the evidence would undermine its claim against WSDOT? We think not. We find persuasive the reasoning of *Henderson*: "unless there was bad faith, there is no basis for 'the inference of consciousness of a weak cause.'" 80 Wn. App. at 609 (quoting 2 MCCORMICK ON EVIDENCE § 265, at 191 (John William Strong ed., 4th ed. 1992)).

> If a party to a civil case has destroyed relevant evidence in bad faith, the fact of destruction is normally admissible on the theory that the destruction suggests consciousness of potential liability or consciousness of other adverse consequences if the evidence were to be presented to a trier of fact. In other words, it reveals the party's own belief that he or she has a weak case.

- 36 -

No. 79460-4-I/37
(consolidated with No. 79890-1-I)

5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 402.5, at 280 (6th ed. 2016). Failing to preserve evidence, either negligently or through a conscious disregard of its importance, does not demonstrate a consciousness of a weak case or a desire to suppress the truth. We therefore conclude that an adverse inference jury instruction is not an appropriate sanction for spoliation if the party's failure to preserve evidence is neither intentional nor rises to the level of bad faith.

D. Adequacy of Trial Court's Culpability Findings

STP maintains the trial court's findings are insufficient to support the conclusion that spoliation occurred, or that STP acted with the requisite level of culpability to warrant an adverse jury instruction. We agree that, while the trial court's findings may support some sanction against STP, the court did not make the requisite culpability findings to warrant the imposition of an adverse inference instruction. It found that "[STP's] explanation for the destruction of the pipe fragments, while perhaps not clearly evidencing intent, can hardly be characterized as innocent given the stakes. It has offered no explanation for the loss or destruction of the journals." This finding tells us that STP's conduct was not innocent. But it is not a finding that STP acted intentionally or willfully with an improper motive.

Although STP's culpability for destroying or losing this same evidence was fully litigated in the Thurston County Contract Case, that court also found, at most, that STP acted with a conscious disregard for the importance of the missing pipe pieces and boulders. It found no bad faith conduct in the loss or destruction of the

- 37 -

No. 79460-4-I/38
(consolidated with No. 79890-1-I)

evidence.[20]   Because the King County trial court did not find that STP acted intentionally or in bad faith in its destruction or loss of any of the evidence, it erred in imposing an adverse inference instruction as a spoliation sanction.

E.  Relevance and Importance of the Evidence

Even if conscious disregard was an adequate level of culpability for such a harsh sanction, we would nevertheless reverse on the ground that the trial court's findings fail to explain the potential importance of the missing evidence to WSDOT in its claim against the Insurers.

*Henderson* tells us that the importance of any missing evidence "depends on the particular circumstances of the case."  80 Wn. App. at 607.  This statement suggests the issue is a question of fact.  But assessing the relevance or probative value of any piece of evidence, missing or not, requires a court to apply facts to well-established evidentiary standards.  Thus, whether missing or lost evidence is important or relevant for the purposes of a spoliation analysis is a mixed question of fact and law.  *See In re Trust and Estate of Melter*, 167 Wn. App. 285, 300, 273 P.3d 991 (2012) (mixed questions of fact and law involve the application of legal precepts to a particular set of factual circumstances).  We therefore review de novo the trial court's ruling as to the importance or relevance of the missing evidence. *In re Dependency of G.M.W.*, 24 Wn. App. 2d 96, 127, 519 P.3d 272 (2022) (mixed question of fact and law subject to de novo review).

---

[20] The Thurston County Superior Court found evidence of bad faith only in STP's failure to disclose to WSDOT that the evidence had disappeared.  Thurston FF&CL at 44.  STP's bad faith conduct after the evidence went missing does not determine its culpability for the loss of the evidence itself.

- 38 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 79460-4-I/39
(consolidated with No. 79890-1-I)

The parties here agree that the pipe pieces and boulders are relevant to STP's claim of causation. But they disagree as to that evidence's importance. We have considered the following six factors in assessing the importance of missing, lost or destroyed evidence: (1) whether the missing evidence would provide direct evidence of a claim or defense;[21] (2) whether the lost evidence is cumulative of other available evidence;[22] (3) whether the culpable party admitted the evidence's importance;[23] (4) whether the nonspoliating party had the opportunity to inspect the evidence before it was lost;[24] (5) whether the loss of the evidence impeded parties from developing expert opinions on liability, causation or damages;[25] and (6) whether the loss of the evidence gave the culpable party an investigative advantage to the prejudice of the nonspoliating party.[26]

First, the pipe pieces and boulders would be direct evidence that could support or undercut STP's claim that the TBM malfunctioned, not because of a design defect as the Insurers contend, but because of a pipe strike or an encounter

---

[21] *Henderson*, 80 Wn. App. at 607-08 (missing vehicle was of questionable investigative value); *J.K. by Wolf*, 20 Wn. App. 2d at 306 (missing video footage would have provided direct evidence of alleged child assault on playground and on bus or direct evidence of playground supervisor not at their post at time of assault).

[22] *Henderson*, at 608-09 (extensive photographic evidence of car existed, mitigating importance of the vehicle itself and experts were able to reach conclusions as to who was behind wheel at time of accident and how extensive Tyrrell's injuries were).

[23] *J.K. by Wolf*, 20 Wn. App. 2d at 309-10 (school district employees admitted evidence was highly important and needed to be preserved); *Cook*, 190 Wn. App. at 462 (the fact that the culpable party investigated the evidence is relevant to determining its importance, but is not determinative).

[24] *Henderson*, 80 Wn. App. at 608-09 (both parties had opportunity to inspect vehicle before it was destroyed); *Marshall*, 94 Wn. App. at 382-83 (plaintiff had over four years to inspect treadmill machine).

[25] *Cook*, 190 Wn. App. at 462 (fact that neither party presented expert who examined evidence before its destruction diminishes its importance); *Carroll*, 22 Wn. App. 2d at 896 (neither party's experts were aware that autopsy occurred so significance of undisclosed autopsy report was diminished).

[26] *Henderson*, 80 Wn. App. at 607; *Cook*, 190 Wn. App. at 462.

- 39 -

No. 79460-4-I/40
(consolidated with No. 79890-1-I)

with unexpected boulders. We understand the evidence is important to the Insurers because STP is seeking insurance coverage based on a pipe strike theory of causation. But the Insurers have no legal right to any spoliation sanctions so the importance of the evidence to them is immaterial.

As to WSDOT, it is unclear from this record or the trial court's findings how this evidence would advance or undercut WSDOT's claim for insurance coverage. While we appreciate that this evidence was extremely important in the Thurston County Superior Court Contract Case, where WSDOT was defending STP's differing site condition claim, WSDOT prevailed in that litigation, both at trial and on appeal. The claims in this lawsuit are much different. WSDOT, like STP, seeks to recover under insurance policies against the Insurer. WSDOT seeks no monetary relief from STP.

In this lawsuit, WSDOT originally sought coverage from the Insurers based on the assertion that its losses were caused by operator error, design defects, or a combination thereof, both of which it claimed were covered losses. Our Supreme Court has since determined that damages caused by design defects are *not* covered under the insurance policy. *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 200 Wn.2d 315, 332, 516 P.3d 796 (2022). Thus, WSDOT is now relying on operator error as the coverage-triggering cause of its losses. But WSDOT does not contend that the missing evidence is necessary to establish the existence of operator error.

Its importance to WSDOT appears to be in disproving STP's contention that the pipe and/or boulders caused the machine's malfunction. But WSDOT

- 40 -

No. 79460-4-I/41
(consolidated with No. 79890-1-I)

conceded at oral argument that it would prevail in its coverage claim under the builder's risk policies regardless whether the cause of the TBM breakdown was operator error or a pipe strike. Wash. Court of Appeals oral argument, *Seattle Tunnel Partners, et al. v. Great Lakes Reinsurance (UK) PLC, et al.,* No. 83343-0-I (Jan. 10, 2023) at 26 min., 20 sec. to 27 min., 5 sec. The missing evidence has less importance where, as here, it will have little effect on WSDOT's coverage claim against the Insurers.

Second, as STP has noted, there are pieces of TW-2 available that can be analyzed and there is extensive photographic and video evidence of the missing evidence. The parties' respective experts have used this evidence to conduct their respective analyses. As in *Henderson*, the missing evidence is cumulative of what is otherwise available to the parties and their experts.

Third, STP admittedly deemed this evidence to be relevant and important. The trial court found that "STP recognized the importance of preserving the [pipe] fragments." This finding, unchallenged on appeal, is consistent with the finding of the Thurston County Superior Court, that "Hauser wanted each piece maintained so that everyone involved had the ability to analyze it, look at it, measure it, weigh it, or do anything else that was available to determine what happened. He knew the physical objects were critical and important." Thurston FF&CL at 7. STP did not assign error to this factual finding in its appeal of the spoliation decision in Division Two of this court. These facts weigh in favor of WSDOT and the importance of the lost evidence.

- 41 -

No. 79460-4-I/42
(consolidated with No. 79890-1-I)

Fourth, it appears from the Thurston County Superior Court findings that WSDOT was not denied the opportunity to inspect the missing evidence. The Thurston County Superior Court found that WSDOT employees inspected and photographed pipe pieces on numerous occasions, actually observed steel pieces of TW-2 come through the TBM or saw them immediately afterward, took pictures of them, and received STP's contemporaneous photographs and documents recording its employees' first-hand observations. Thurston FF&CL at 22. WSDOT also witnessed "hyperbaric interventions" that occurred in January 2014, during which it saw a piece of steel casing found between spokes of the TBM's cutterhead. *Id*. at 23. And in December 2013 and January 2014, WSDOT "regularly received reports from its employees, contractors, and consultants of pieces of steel entering the TBM, which were identified as pieces of TW-2 and were photographed, videoed, and described as they were found." *Id*.

Fifth, the trial court found that

experts on all sides have reached their conclusions without access to these physical objects. The moving parties' experts have testified that they would find such access useful, and in particular to perhaps further bolster their criticism of STP's conclusion that the pipe was essentially the sole cause of the TBM breakdown. No expert claims that the lack of ability to physically examine the fragments severely impacts the ability to reach expert conclusions.

These findings have not been challenged on appeal and we therefore accept them as verities. *Carroll*, 22 Wn. App. at 862. The fact that the experts for both WSDOT and STP were able to develop their opinions in the absence of this evidence diminishes its importance.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 79460-4-I/43
(consolidated with No. 79890-1-I)

Finally, we cannot identify any evidence supporting a conclusion that the loss of some of the pipe pieces or boulders has given STP an investigative advantage over WSDOT. The court made no findings as to whether STP actually conducted its own analysis of the evidence before it went missing, but the record suggests it did not. The Thurston County Superior Court found that "[e]xperts retained by all parties to this litigation cannot inspect, measure, or test the missing pipe pieces and boulders. Although various employees and experts for WSDOT and STP were present on the job site before the items went missing, many experts in this litigation were not retained until the items went missing." Thurston FF&CL at 31. This finding supports the conclusion that all of the parties have experienced the same investigative disadvantage from the loss of this evidence.

Our de novo review leads to the conclusion that despite STP's failure to preserve all of the pipe pieces and boulders it recovered from the TBM, the evidence is not of sufficient importance to WSDOT's insurance coverage claim against the Insurers to justify the imposition of an adverse inference instruction against STP.

Conclusion

Because the trial court's decision was based on an incorrect legal standard and the facts do not meet the requirements of the correct legal standard, it abused its discretion in imposing the spoliation sanction of an adverse inference instruction

No. 79460-4-I/44
(consolidated with No. 79890-1-I)

against STP.  We therefore reverse and remand for further proceedings consistent

with this opinion.[27]

_Andrus, J.P.T._____

WE CONCUR:

_Chung, J._____        _Coburn, J._____

___

[27] Because we reverse the spoliation sanction, we need not reach the issues Hitachi raises in its separate appeal.

- 44 -